**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BANKERS LIFE AND CASUALTY COMPANY, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 22 C 50009 |
| AMERICAN SENIOR BENEFITS, LLC; | ) | Judge Rebecca R. Pallmeyer |
| INTEGRITY MARKETING GROUP, LLC; | ) | |
| KEY RETIREMENT SOLUTIONS, INC.; | ) | |
| and HEARTLAND RETIREMENT GROUP, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bankers Life and Casualty Company ("Bankers Life") and Defendant American Senior Benefits ("ASB") are two major players in the hotly competitive insurance industry. The companies have different business models, but agents of both firms vigorously compete in selling various insurance policies to senior citizens. Over the past decade, Bankers Life alleges that many of its former agents have been recruited to join ASB and have, in the process, misappropriated Bankers Life's trade secrets. In response, Bankers Life has filed a series of lawsuits against their former agents, now working with ASB; ASB itself; and ASB's affiliates. In 2018, Bankers Life and ASB agreed to settle their disputes by adopting an agreement known as the "Protocol," which requires ASB to implement procedures to protect Bankers Life's trade secrets. The adoption of the Protocol did not put an end to the conflict, however: according to Bankers Life, ASB has since breached the Protocol numerous times.

This lawsuit resulted. Bankers Life has sued four entities in total: ASB; ASB's corporate parent, Integrity Marketing Group, LLC ("Integrity"); and two of ASB's regional affiliates, Heartland Retirement Group ("Heartland") and Key Retirement Solutions ("Key"). Bankers Life brings a host of claims, including an alleged breach of contract claim stemming from ASB's violation of the Protocol; trade secret misappropriation claims under the federal Defend Trade Secrets Act

("DTSA") and the Illinois Trade Secrets Act ("ITSA"); a claim that ASB has engaged in tortious interference with Bankers Life's non-solicitation contracts with its agents; and a claim that Defendants' various activities constitute a civil conspiracy under Illinois law.

Each Defendant has moved separately for summary judgment. As explained below, these motions [150, 152, 154, 156] are granted in part and denied in part.

## BACKGROUND

In the paragraphs below, the court addresses the factual and procedural background of this case. The facts laid out below are taken primarily from the parties' respective Local Rule 56.1 statements, as well as the record evidence produced by the parties.[1] As required at this stage, the court takes the facts in the light most favorable to Bankers Life, the non-moving party, and draws all reasonable inferences in its favor. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

### I. The Parties

American Senior Benefits and Bankers Life compete in the same market, but have different business models. Bankers Life "provides seniors with a range of insurance and financial products, including long-term care insurance, life insurance, annuities, and Medicare Supplement Insurance." (Opp'n [173] at 6.) It is a so-called "captive" insurance company, meaning that it operates using a more traditional business model in which Bankers Life agents primarily sell Bankers Life policies directly to customers. (Defs. Resp. to PSOF [199] ¶ 1.) American Senior Benefits, on the other hand, is an "independent marketing organization" ("IMO") that does not

---

[1] Bankers Life objects to this court's consideration of much of Defendants' Omnibus Local Rule 56.1 statement, noting that it is oversized. (Pl. Resp. to DSOF [175] at 22.) Local Rule 56.1(d)(5) states that, "[a] movant's LR 56.1(a)(2) statement of material facts must not exceed 80 numbered paragraphs . . . A party must seek the court's permission before exceeding th[is] limit[]." LR 56.1(d)(5). Defendants' LR 56.1 statement includes more than 155 paragraphs, nearly double the amount allowed by the rule, and was filed without leave of court. The court recognizes that there are various factors that might warrant the filing of an oversized LR 56.1 statement, including the complexity of this case and the number of Defendants. Regardless, the proper procedure would have been to request leave prior to filing, instead of simply submitting a document that does not conform to this court's requirements. Bankers Life's objection is overruled, but the court expects strict compliance with local rules moving forward.

itself develop or sell insurance policies.  Instead, ASB negotiates with hundreds of third-party insurance providers (such as Blue Cross Blue Shield) to obtain favorable pricing, and then enables its affiliated agents (who are contractors, not employees, of ASB) to sell the third-party companies' policies to customers.  This structure, according to ASB, enables "its policyholders to get favorable pricing."  (Defs. Resp. to PSOF ¶ 1.)  Like Bankers Life, ASB's primary focus is on selling insurance policies designed for seniors—including Medicare supplement insurance, annuities, and life insurance—and the company's agents compete with Bankers Life's agents for those customers.  (*See* Gelineau Dep. [158-39] at 12:15–12:22.)    ASB is co-managed by James Sweeney and Clay LeGeyt, both of whom were once (at times not clear from the record) employees of Bankers Life.  (DSOF [158] ¶ 18.)

ASB operates through a network of regional affiliates, known as regional sales managers ("RSMs").  RSMs are not W2 employees of ASB—instead, they are typically organized as separate companies.  (DSOF ¶ 21.)  Defendants Heartland and Key,[2] which are both RSMs of ASB, are organized as a corporation and LLC, respectively.  (DSOF ¶¶ 4–5.)  ASB has no ownership interest in Heartland, Key, or any other RSM.  (DSOF ¶ 22.)

While RSMs appear to play an important role in ASB's business, the exact contours of the their responsibilities are not clear from the record.  The parties agree that the primary role of RSMs is to recruit agents for ASB.   (DSOF ¶ 44; Pl. Resp. to DSOF [175] ¶ 44.)  Once recruited, a prospective agent signs an "Agent Agreement" with ASB, becomes an agent of ASB, and is then authorized to sell third-party insurance products available on the ASB portal, at rates negotiated by ASB.  (DSOF ¶ 44; PSOF [174] ¶ 52.)  Although each agent is affiliated with an

---

[2]        Both parties agree that Heartland is "operated" by Tyler Lainson and Key is "owned" by Matthew Ruddick.  (*See* DSOF ¶ 42; Pl. Resp. to DSOF ¶ 42.)

RSM, the agents themselves are independent contractors, and are paid by ASB.[3] (*See* Lainson Dep. [158-12] at 11:1–11:6 (describing commission structure); DSOF ¶ 46.)

Beyond agent recruitment, the functions served by the RSMs is not clear to the court: neither party explains whether RSMs exercise day-to-day supervision over the agents affiliated with them, whether the RSMs contribute to agents' compensation, or how the RSMs generate revenue. Even among Defendants, there is conflicting testimony concerning the responsibilities of RSMs. For example, Venae Jewett, ASB's Chief Operating Officer, testified that RSMs play some role in administering the so-called "Protocol" (an agreement between Bankers Life and ASB, described below), which suggests that RSMs do have at least some supervisory role with respect to agents. (Jewett Dep. [158-9] at 34:13–34:17.) Similarly, Sweeney's testimony suggests that RSMs can offer their agents rewards, can schedule "conventions or trips," can control their agents' sales practices, and can promote or demote agents affiliated with them. (*E.g.*, Sweeney Dep. [158-6] at 60:12–61:6.) But on the other hand, Matthew Ruddick, the owner of Defendant Key (an RSM), suggests that RSMs' supervisory role is more limited: he explained that because agents affiliated with an RSM are independent contractors paid by ASB, he does not control their activities. (*See* Ruddick Dep. [158-37] at 74:18–74:20.) And Tyler Lainson, the operator of Defendant Heartland, similarly distanced himself from his agents. He testified that while *ASB* has a responsibility to ensure that "agents aren't violating insurance regulations" (Lainson Dep. [158-12] at 71:23–72:1), RSMs "can only advise" agents to follow those regulations.[4] (*Id.* at 72:14–

---

[3]     *See, e.g.*, Sweeney Dep. [158-6] at 65:7–65:15; 72:10–72:23 (noting that an agent can "be his own corporation" or can "own[] his own business as well"); *id.* at 50:13–50:14 ("We pay all commissions for KRS and all of their agents"). It is not clear whether RSMs also contribute a portion of agents' income, but Sweeney suggests that RSMs can give "rewards" to agents affiliated with them. (*Id.* at 60:21–22.)

[4]     When asked about the role of RSMs, Lainson testified: "[RSMs] recruit agents. They train agents on products. They train agents on, you know, sales processes; provide guidance, supervision as far as if they have questions around, you know, the products that they solicit, et cetera." (Lainson Dep. [158-12] at 73:5–73:9.)

17). Ultimately, Defendants' briefing does not present a coherent view of ASB's business structure.

In fact, many details about how ASB operates—especially with respect to its relationship with RSMs—are hotly disputed by the parties. ASB insists that it is almost entirely uninvolved with the activities of Key, Heartland, and other RSMs. It states verbatim, no fewer than thirty-two times in its Local Rule 56.1 statements, that "neither ASB nor Integrity direct the manner or fashion that [RSMs] do business, recruit, or otherwise operate." (*See, e.g.*, DSOF ¶ 47; Defs. Resp. to PSOF ¶ 30.) It repeatedly represents itself as simply the "marketing arm" of RSMs, which it characterizes as "independent insurance sales offices." (DSOF ¶ 17, Defs. Resp. to PSOF ¶ 30.) In fact, ASB's more flexible and decentralized business structure appears to be a key part of the company's marketing and public image. For example, Greg Gelineau, an ASB executive, testified that ASB does not "hold people ransom if they don't want to work with us. They can take their clients, their agents, and go anywhere they want, as long as they don't owe us money and haven't done anything incorrect." (Gelineau Dep. [158-39] at 12:2–12:6). Likewise, Mr. Sweeney testified that ASB does not dictate how an RSM "want[s] to build their business. They can go knock or doors or they can sell. That's two different things. We don't care. They can sell all Medicare products or all annuities. We don't care. They can sell all Blue Cross Blue Shield instead of United [Healthcare]. We don't care. . . . ASB has no control over the method and manner of how KRS conducts business." (Sweeney Dep. [158-6] at 56:20–57:6.) In short, according to Defendants, RSMs are "all separate entities able to conduct their business how they see fit." (ASB Br. [151] at 14.)

But Bankers Life argues ASB does much more than marketing—and there is evidence that supports that position. For one, all ASB agents, despite their affiliation with an RSM, are paid by ASB. (Sweeney Dep. [158-6] at 50:13–50:16.) Perhaps due to the fact that ASB pays them, many agents and affiliates themselves appear to believe that they are closely affiliated with ASB. For example, according to Ms. Jewett, many ASB agents market themselves "under the name

American Senior Benefits," outwardly presenting themselves as agents and affiliates of ASB. (Jewett Dep. [158-9] at 28:19–29:16.)  Her deposition testimony also references some RSMs that evidently hold themselves out as servicing particular geographic regions on behalf of ASB.  (*See id.* at 28:3 (discussing "American Senior Benefits of Minnesota").)  This accords with the testimony of Colton Skirvin, the national director of training for Heartland, who testified that Heartland is simply a "region[]" with ASB.  (*See* Skirvin Dep. [180] at 14.)

In addition, contrary to ASB's vehement denials, Bankers Life contends that ASB does operate some degree of oversight over ASB agents.  (*See* Opp'n [173] at 10.)  Plaintiffs chiefly point to the degree of control that ASB operates over recruitment and activities of its agents.  After they are onboarded, all ASB agents must sign an "Agent Agreement" with ASB that specifically states that the agent acts as a limited "agent for ASB."  (Agent Agreement [158-15] at 1, 4.)  This agreement is lengthy, but contains a number of provisions that purport to give ASB supervisory authority over its agents.  For example, the contract states that all agents must comply with "all of ASB's rules and regulations as such may be amended from time to time," confirming that ASB can establish rules that become binding on its agents.  (*Id.* at 4.)  And it also includes other restrictions explicit in the terms of the contract:  it prohibits agents from misappropriating ASB's trade secrets, which it defines as including "agent customer or client lists," "amounts and types of insurance," "expiration and renewal dates of poli[cies]", "business leads," and "claims histories." (*Id.* at 6.)  It also includes a restrictive covenant,[5] which prohibits departing ASB agents from (1)

---

[5]    The existence of a restrictive covenant in ASB's own agent agreement is at odds with the repeated insistence of ASB representatives that ASB's decentralized structure allows agents to leave the company, with their clients, at any time.  It appears that ASB's employees themselves do not fully understand how their own company works.  For example, Mr. Gelineau, an ASB executive, testified in a deposition that it would be "ridiculous" for ASB to have a restrictive covenant, noting that agents "can take their clients . . . and go anywhere they want, so long as they don't owe us money and haven't done anything incorrect."  (Gelineau Dep. [158-39] at 12:2–12:6.)  But later, in that same deposition, after being shown a copy of ASB's agent agreement, he acknowledged that the company's agents are in fact subject to a restrictive covenant.  (*Id.* at 126:6–127:6.)

soliciting policyholders of ASB's contracted carriers, or (2) persuading any other ASB agent to "terminate or reduce" his or her relationship with ASB.[6]  (*Id.* at 5.)

Moreover, the existence of this contract in the first place suggests that it is ASB—and not any particular RSM—that has the final decision on whether or not to make a particular individual an agent of the company.  The testimony of Sweeney supports this:  He testified that, in his capacity as an ASB executive, he has the "final decision-making authority" regarding whether or not a particular agent is associated with an RSM.  (*See* Sweeney Dep. [158-6] at 62:17–63:10.) He also testified that he could fire any ASB agent at any time.  (*Id.* at 96:8–98:3 ("I'm saying I have the authority to terminate anybody any time I want.").)

There is one additional player in this complex arrangement—Defendant Integrity, which acquired Defendant ASB and Defendant Heartland in 2019.[7]  According to the deposition testimony of Eric Pederson, Integrity's Rule 30(b)(6) corporate representative, Integrity is also an IMO, and does not itself underwrite risk or sell insurance products.  (DSOF ¶ 33; Pederson Dep. [182] at 11:23–12:7.)  Instead, Integrity functions much like ASB:  it "develops and distributes life and health insurance products and wealth products with carrier partners, and markets these products through its distribution network, which includes other large insurance agencies located throughout the country that have more than five hundred thousand independent agents and

---

[6]    In addition to what Bankers Life has identified, the court notes other evidence if ASB's exercise of control over agents and RSMs.  For example, Sweeney testified that ASB restricts its agents from selling any third-party insurance policy other than those that are from "ASB-endorsed carriers."  (Sweeney Dep. [158-6] at 67:18–68:7.)  Likewise, Jewett testified that ASB "monitor[s]" RSMs and agents to ensure steady production and prevent "problem[s] in the office."  (Jewett Dep. [158-9] at 53:21–53:24.)

[7]    The exact date of Integrity's acquisition of ASB is unclear.  In Defendants' Statement of Facts, Defendants state that this acquisition occurred in "October 2018," a fact that Bankers Life admitted in their response.  (DSOF ¶ 32; Pl. Resp. to DSOF ¶ 32.)  But in its Statement of Facts, Bankers Life claims that Integrity acquired ASB "as of June 17, 2019" (PSOF ¶ 22)—Defendants responded that "Integrity purchased ASB either on June 30, 2019 or July 1, 2019."  (Def. Resp. to PSOF ¶ 22.)  It is not clear which of these four dates is correct, but the precise date is not material to the outcome of this motion.

advisors." (DSOF ¶ 35; Pl. Resp. to DSOF ¶ 35.) As the corporate parent, Integrity pays for Heartland's operating expenses (Lainson Dep. [158-12] at 13:19–14:24), and pays many of ASB's employees, including Sweeney. (Sweeney Dep. [158-6] at 14:6–14:13; Pl. Resp. to DSOF ¶ 36.)

Like the details about ASB's operational structure, details of how Integrity plays into the broader ASB arrangement are not clear from the record. Integrity wholly owns ASB and Heartland,[8] but the degree of control that Integrity operates over the day-to-day affairs of its subsidiaries is disputed. According to Mr. Pederson, whenever an insurance policy is sold by an ASB agent, the money is paid first to ASB, who pays commission to agents, and remaining funds "simply flow[] up the chain" to Integrity. (Pederson Dep. [182] at 25:5–25:14; *id.* at 38:18–38:24).) But Pederson also testified that Integrity does not "have any involvement in [] day-to-day operations" of its subsidiaries. (*Id.* at 49:15–49:17.) Bankers Life disputes this characterization, noting that Integrity provides the parties with "compliance support" (Pl. Resp. to DSOF ¶ 37, 45), and that "Integrity would have access to anything that sits on ASB's servers or data storage." (PSOF ¶ 28.) Integrity acknowledges that it could access ASB's servers, but disputes that it in fact does so. (*See* Defs. Resp. to PSOF ¶ 28.)

## II. The Protocol and Alleged Breach

In 2015, Bankers Life filed a lawsuit against ASB, "alleging tortious interference with contracts and with prospective business."[9] (PSOF ¶ 43.) In 2018, Bankers Life and ASB entered

---

[8]     Integrity does not own Defendant Key. (Pederson Dep. [182] at 45:23–46:1.)

[9]     While the parties do not provide information concerning the venue, caption, jurisdiction, or any other details regarding the lawsuit from which the Protocol originated, the text of the Settlement Agreement suggests that the lawsuit was *Bankers Life & Casualty Co. v. Amer. Senior Benefits LLC, et al.*, 2015 CH 12601, filed in Cook County Circuit Court before Judge Meyerson. (Settlement Agreement at 2.) This Settlement Agreement was not submitted by the parties as part of the summary judgment record. But because the alleged breach of the Protocol is a central part of the case, the court ordered the parties to produce it. The parties submitted the document via email due to "negotiated confidentiality." The court directs now that it be filed under seal, with a redacted version filed in the public record. *See generally Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) (confirming the presumption of public access to materials considered by the court).

into a settlement agreement which included, among other things, an agreement the parties refer to as the "Protocol."[10]   (*Id.*)   The Protocol [158-44] includes a number of requirements and restrictions on ASB's recruitment of former Bankers Life agents.  Most prominently, the Protocol requires ASB, before "appointing or hiring any person," to ask them "if they are a current or former [Bankers Life] agent or employee."  (Protocol [158-44] § I.A.)  If so, and if the prospective agent left Bankers Life within the previous two years, ASB is required to take the following actions:

(1)  Require the prospective agent to give a one-week written notice to Bankers Life, and provide ASB with a written copy of said notice (*id*. § I.C.1–3);

(2) Advise the agent, in writing, "not to breach their Agent Agreements with BLC, including, without limitation, the confidentiality, non-disclosure, customer non-solicitation and agent/employee non-recruitment provisions contained in their Agent Agreements" (*id*. § I.C.4);

(3) Inform Bankers Life directly whenever it "engages or hires a current or former BLC agent or employee if that person has left BLC within the prior 24 months and is still subject to a restrictive covenant" (*id*. § II.A); and

(4) Advise the prospective agent that "they [are] required to adhere to the terms of their Agent Agreements until such time [as] the restrictive covenants are no longer applicable."  (*Id.* § II.B.)

If ASB becomes aware that an agent is violating the Protocol, the Protocol requires ASB to:

(1) Instruct the new ASB Appointee [to cease the prohibited conduct].

(2) Either end the relationship with the individual and immediately notify [Bankers Life], or invoke [the] exhaustion of remedies protocol.

a. In the event that ASB invokes the exhaustion of remedies protocol, ASB shall identify the facts and particularities of the individual's alleged breach and provide same to BLC.

b. If the individual's breach is material, and not readily remediable, ASB will terminate the relationship with the individual.

(*Id.* § II.C.)  The "exhaustion of remedies" provision requires the non-breaching party to offer an opportunity to cure, and requires both parties to submit to third-party mediation prior to commencing litigation.  (*Id.* § III.)

---

[10]     Heartland, Key, and Integrity are not parties to the Protocol.

Whether ASB has breached the Protocol is disputed. ASB claims that it implemented the Protocol's requirements by creating a questionnaire that was sent to prospective agents, inquiring about any ties to Bankers Life (DSOF ¶¶ 122–131), and by advising RSMs in writing of their responsibility to abide by the Protocol. (*Id.* ¶ 125.) It is not clear who at the company was responsible for enforcing other elements of the Protocol—Sweeney's testimony suggests that it was "sometimes" the RSM who was responsible, but on other occasions it was the "recruiting person." (Sweeney Dep. [158-6] at 92:6–92:14.) ASB appears to believe that these actions were sufficient to discharge its duties under the contract. (*See* ASB Br. [151] at 9.) Notably, as Sweeney explained during his deposition, ASB did not investigate the truth of prospective agents' responses to the questionnaire, meaning that no action was taken against agents whose answers were untruthful. (Sweeney Dep. [158-6] at 93:11–94:13.) Sweeney characterized agents' dishonesty as "part of the issue" leading to this lawsuit, referring to it as a "flaw" in "the process that [ASB] established to follow the Protocol." (*Id.* at 94:9–94:13.)

For its part, Bankers Life alleges that ASB breached the Protocol in two primary ways.[11] According to Bankers Life, ASB breached (1) when it hired at least eighteen Bankers Life employees without providing notice to Bankers Life (Opp'n [173] at 31),[12] and (2) "when it failed to obtain the written notice of departure" from at least nine Bankers Life employees.[13] (*Id.* at 31–32.) As an example, Bankers Life points to the recruitment of Nick Derouin, a Bankers Life employee who resigned from his position as a Branch Sales Manager with the company without

---

[11]    Bankers Life claims that it plans to prove additional instances of breach at trial, but has presented these clear instances of breach as sufficient to defeat summary judgment.

[12]    According to Bankers Life, those employees are: Nick Derouin, John Naveroski, Gayle Monroe, Michael Strauss, Alyssa Vinke, Anthony Dickerson, Madyson Derouin, Melanese Stitts, Amaya Coval, Marie Johnson, Christopher Jones, Nadine Kaakouche, Darshay Poage, Leila Scott, Dan Johnson, Christopher Williams, Mithcell Bernard, and Stevie Moman. (Opp'n [173] at 31.)

[13]    According to Bankers Life, those employees are: Nick Derouin, Constantine Darsaklis, Michael Strauss, Alyssa Vinke, Anthony Dickerson, McDaniel, Roy Pierce, Timothy Eckman, and Matthew Dalton Adkins. (Opp'n [173] at 31–32.)

notice on August 3, 2020.  (*Id.* at 17; PSOF ¶ 46.)  Derouin completed ASB's onboarding paperwork on August 17, 2020, but ASB failed to notify Bankers Life of his onboarding, in apparent violation of the Protocol.  (PSOF ¶ 47.)

### III.  Trade Secrets and Alleged Misappropriation

Bankers Life also alleges that its departing agents misappropriated its trade secrets in violation of state and federal law.  Bankers Life points to five categories of trade secrets, known respectively as the (1) Customer List Trade Secrets, (2) Pricing Trade Secrets, (3) Marketing Trade Secrets, (4) Compensation Trade Secrets, and (5) Lead List Trade Secrets. (Opp'n [173] at 7–8.)  Each category is described by Bankers Life as follows:

- "Customer List Trade Secrets" are defined as "detailed customer and policyholder information, including policyholder lists, their contact data, and documents referred to as 'policyholder cards' or 'fact finders.'"  (PSOF ¶ 4.)  Included with this information are "policyholder goals and concerns, health and financial information, beneficiary details, and other data relevant to insurance purchase decisions."  (*Id.* ¶ 5.)  According to Bankers Life, this individual policyholder data is not public—if it were, its competitors could use the information to target their policyholders.  (*Id.* ¶ 76.)

- "Pricing Trade Secrets" include confidential rate and price information, which Plaintiff characterizes as including "highly sensitive individualized insurance policy pricing for specific policyholders that is not publicly available." (*Id.* ¶ 7.) This includes "confidential information on how policies are priced based on factors such as age and gender, as well as details about non-guaranteed elements and anticipated rate increases, and this information differs from the generic rate information filed with federal and state regulators." (*Id.* ¶ 8.)

- "Marketing Trade Secrets" includes "information widely considered proprietary and confidential, such as sales manuals, training materials, product information, sales steps, best practices, marketing techniques, and approaches to market penetration, including company-wide and localized plans." (Opp'n [173] at 7.)  Beyond these vague descriptions, Bankers Life provide no information on these marketing documents, and does not name any of them explicitly.

- "Compensation Trade Secrets" are "commission and sales performance information" that "includes commission rates, bonus structures, and sales rankings and performance metrics for agents and managers."  (*Id.* at 8.)  Bankers Life claims that "[s]uch information is used internally for performance management and may be used [by a competitor] to identify high-performing agents for recruitment or solicitation."  (PSOF ¶ 12.)

- Finally, "Lead List Trade Secrets" include "prospect and lead lists" that "are compiled through a combination of third-party data acquisition, proprietary filtering, and internal marketing efforts."  (*Id.* at 8.)

This information is, according to Bankers Life, critical to the success of its business, and Bankers Life therefore has taken steps to keep the information confidential. These efforts include: "agent agreements requiring confidentiality and non-solicitation, supervision, restricted access, password-protected systems, role-based controls, download monitoring and alerts, physical security cease and desist efforts, and litigation." (PSOF ¶ 77.) In addition, Bankers Life claims to have imposed a variety of digital access controls designed to protect information on its servers. It points to, for example, "role-based access controls" that limit a user's access to policyholder data, meaning that "[o]nly those with a need to know are granted access." (Opp'n [173] at 27.) Scott Goldberg, Bankers Life's President and corporate representative, testified that as a result of these controls, in most circumstances, only those agents working with a particular policyholder would have access to that household's policy information. (Goldberg Dep. [217] at 34:13–37:8.)

Further, Bankers Life claims that several former agents misappropriated these trade secrets as they left Bankers Life to join ASB. For example, Christian McDaniel, a former Bankers Life agent, downloaded a wealth of Bankers Life policyholder information on the day he resigned from the company and joined Defendant Heartland. (Opp'n [173] at 16–17.) During his deposition, he acknowledged that he did in fact download this information, but claims that it was a mistake, that his "intent was just to get my family's policy details" (which he characterizes as a "pretty extended and large family"). (McDaniel Dep. [158-43] at 89:18–90:9.) Bankers Life sued, and a forensic investigation of his computer during the litigation revealed a folder with Bankers Life policyholder information on it.[14] (PSOF ¶ 67.) (The parties provide no further information about this lawsuit or its outcome.)

Bankers Life also points to the deposition testimony of Matthew Ruddick, the owner of Defendant Key. (Opp'n [173] at 19, 28–29.) That testimony supports Bankers Life's contention

---

[14] When asked during his deposition, Tyler Lainson, the operator of Heartland, testified that while he was aware that Bankers Life sued McDaniel, he could not recall whether Bankers Life documents were found on McDaniel's computer. (Lainson Dep. [158-12] at 27:16–27:24.)

that RSMs took no action in response to learning of trade secret misappropriation by agents affiliated with them. Ruddick testified that he was aware that "Bankers Life's information" (it is not clear exactly what information) was found on the computers of agents, including Nick Derouin, who joined Key from Bankers Life. (Ruddick Dep. [158-37] at 84:13–84:18.) Ruddick evidently asked Derouin if he had confidential information on his computer; when Derouin denied this, Ruddick took no further action. (*Id.* at 87:17–87:19.) The same was true of another group of unnamed agents from the "Bankers Life Las Vegas office" (Opp'n [173] at 29): after Ruddick became aware that they had been sued by Bankers Life for misappropriation, he took no action other than asking whether the allegations were true. (Ruddick Dep. [158-37] at 88:5–88:20.) He claimed that "nothing else" could be done, evidently because the agents were independent contractors. (*Id.* (discussing Las Vegas group); *id.* at 74:18–74:20 ("Outside of that, there is not much that I can do because, again, these are independent contractors and independent agents.").) One of these agents evidently wiped her computer after being ordered to produce it for forensic evaluation by a federal judge in a separate case (again, one for which the parties have provided no further details). (Opp'n [173] at 19.) Ruddick testified that he did not believe this to be suspicious, and evidently did nothing in response to learning of the agent's spoliation. (*Id.* at 89:20–90:14.)

## IV.    Procedural History

This lawsuit resulted. Plaintiff's Amended Complaint brings four claims against all Defendants: (1) a misappropriation of trade secrets claim under the federal Defend Trade Secrets Act, 18 U.S.C. § 1863 (Count I); (2) a misappropriation claim under the Illinois Trade Secrets Act, 765 ILCS § 1065 (Count II); (3) a tortious interference claim under Illinois state law (Count IV), and a civil conspiracy claim under Illinois law (Count V). (*See* Amended Compl. [32].) Plaintiff also brings a breach of contract claim (Count III) against ASB for alleged violations of the Protocol. (*Id.*) Defendants moved to dismiss [43] Count V, but Judge Reinhard of this court denied the motion on January 18, 2023 [61]. On July 31, 2025, each Defendant filed a separate motion [150,

152, 154, 156] for summary judgment.[15] Plaintiff responded with a single brief [173] on September 24, 2025, and Defendants each replied separately (in nearly identical briefs) [195, 196, 197, 198] on October 24, 2025. The motion is now fully briefed and ready for the court's consideration.

## LEGAL STANDARD

Summary judgment is appropriate "if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In considering a motion for summary judgment, "the district court must construe all facts and draw all reasonable inferences in favor of the non-movant." *Srail v. Village of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009).

Once a motion for summary judgment has been properly supported, the opposing party must produce affirmative evidence showing there is more than a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). An opposing party must produce affirmative evidence raising a genuine issue for trial; they may not rest upon allegations in the pleadings. *Anderson*, 477 U.S. at 256–57. Speculation "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

## DISCUSSION

## I.     Breach of Contract—Count III

The court first considers Plaintiff's breach of contract claim. As discussed above, this claim arises out of Defendant ASB's alleged breaches of the Protocol. ASB moves for summary

---

[15]     Each Defendant filed a separate brief in support of summary judgment, but the briefs are nearly word-for-word identical to one another. (*See* ASB Br. [151]; Heartland Br. [153]; Integrity Br. [155]; Key Br. [157].) As noted earlier, *supra*, at 2 n.1, Defendants relied on a single lengthy statement of material fact.

judgment, arguing that (1) the Protocol is not a binding contract, and (2) even if it is, ASB did not breach it. (ASB Br. [151] at 9.) Neither argument is persuasive.

First, as to formation of the contract—the parties clearly intended the Protocol to be a binding agreement. It is undisputed that the parties adopted the Protocol as part of a settlement agreement, and it is well established in Illinois that settlement agreements are typically contracts, and are governed by appropriate principles of contract law.[16] *K4 Enters., Inc. v. Grater, Inc.*, 394 Ill. App. 3d 307, 313, 914 N.E.2d 617, 624, 333 Ill. Dec. 198, 205 (1st Dist. 2009). Defendants do not deny this general principle, but argue that "language at the outset of the Protocol"—in particular, the phrase "The protocols outlined below are intended to *guide* [] ASB . . ."—shows that the parties merely intended the Protocol to be non-binding guidance. (ASB Br. [151] at 9 (emphasis added).) The court is uncertain that such language would require a conclusion that the Protocol was not binding—but it need not reach that issue because the quoted language does not appear in the Protocol or elsewhere in the settlement agreement. (*See* Protocol [158-44].) From what the court can tell, Defendants erroneously quoted an ASB internal memorandum discussing the Protocol, not the Protocol itself.[17] (*See* Memorandum [158-40] at 1 (using the quoted language).) Quite obviously, an internal memorandum discussing a contract's purpose does not affect the contract's validity. And even that memorandum states that "[c]ompliance is required," suggesting that ASB internally viewed the contract as binding. (*See id.*)

As to breach, Bankers Life has put forward evidence sufficient for a jury to find that ASB breached the contract. As explained above, the Protocol requires ASB to (1) require prospective

---

[16]    The breach of contract claim arises under Illinois law; pursuant to the *Erie* doctrine, the court applies Illinois substantive contract law. *See Full Circle Villagebrook GP, LLC v. Protech 2004-D, LLC*, 119 F.4th 522, 525 (7th Cir. 2024) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

[17]    Bankers Life noted in its brief that the quoted language is not included in the Protocol or settlement agreement. ASB made no mention of the issue in its Reply Brief, effectively conceding the point.

employees to give one-week notice to Bankers' Life, and (2) *obtain a copy* of said notice. (Protocol [158-44] at 1.) It also requires *ASB*—i.e., not an RSM, or any individual agent—to "notify [Bankers Life] when [ASB] engages or hires a current or former [Bankers Life] agent or employee if that person has left [Bankers Life] within the prior 24 months and is still subject to a restrictive covenant." (*Id.* at 4.) Bankers Life has shown that ASB violated these provisions with respect to at least one employee, Nick Derouin. Derouin resigned without notice from Bankers Life on August 3, 2020; he subsequently completed ASB's paperwork and became an ASB agent. (*See* PSOF ¶¶ 46–47; Ruddick Dep. [158-37] at 85:2–86:13.) But ASB never notified Bankers Life of Derouin's onboarding. This breach by itself is sufficient to survive summary judgment on Bankers Life's contract claim.[18]

ASB does not contest the facts of Derouin's recruitment. In fact, ASB's Reply Brief effectively ignores Bankers Life's arguments on contract breach and makes no mention of Derouin at all. Instead, ASB focuses on the portions of the contract that they do comply with: they point out that ASB "asks each perspective [sic] agent if they are a current or former Bankers agent or employee" via a "contracting paperwork questionnaire." (ASB Reply [195] at 13.) ASB notes that this questionnaire "informs prospective agents that they must provide a notice of departure to Bankers and ASB," and that they are to otherwise abide by their contractual obligations to Bankers. (*Id.* at 13–14.) But it is not clear why the questionnaire is relevant. One can abide by some provisions of a contract while being in breach of others—ASB may have adhered to portions of the Protocol that required it to question prospective agents about their ties with Bankers, but there is evidence that Derouin's onboarding violated other parts of the Protocol.

---

[18] Plaintiff points to other instances of breach, as well. For example, they claim that evidence at trial will show that ASB failed to notify Bankers Life of its recruitment of agents on at least eighteen other occasions, and that ASB failed to "obtain the written notice of departure from Bankers Life employees" on several occasions. (*See* Opp'n [173] at 31–32.) The court declines to comment on these allegations, for which Plaintiff has not yet presented evidence. *See* Fed. R. Civ. P. 56(c)(1).

ASB's only argument concerning Derouin's hiring appears in its LR 56.1 filing. There, ASB does not contest the facts of his recruitment, but instead tries to wash its hands of it: ASB asserts that Derouin was recruited by an RSM, that ASB is merely the "marketing arm" of its RSMs, and that RSMs, and not ASB, are responsible for recruiting agents. (Defs. Resp. to PSOF ¶¶ 46–47.) As explained below, however, ASB's repeated insistence that it is merely "the marketing arm" of its RSMs, and is otherwise wholly uninvolved in their activities, is simply contrary to the evidence. More importantly, at least with respect to the breach of contract claim, it is irrelevant. The Protocol requires *ASB—not* the RSMs—to notify Bankers Life when a former employee joins ASB. The evidence shows that ASB failed to do so after Derouin was recruited, and the fact that he is affiliated with an RSM has no bearing on ASB's independent contractual obligation to notify Bankers Life. Moreover, because ASB is the signatory of the document, it is ultimately up to ASB to ensure that the Protocol is being followed. While it might have instructed its RSMs to notify Bankers Life whenever they recruit the company's former agents, ASB remains responsible for the RSMs' failure to do so.

Summary judgment is denied on Count III.

## II.    Misappropriation of Trade Secrets—Counts I and II

Next, Bankers Life asserts that Defendants were complicit in the misappropriation of trade secrets by agents who left Bankers Life for ASB. Defendants move for summary judgment on two grounds. First, they focus on the merits of the claim, arguing that Plaintiff's secrets do not qualify as "trade secrets" under either the federal Defend Trade Secrets Act ("DTSA") or the Illinois Trade Secrets Act ("ITSA"). (*E.g.*, ASB Br. [151] at 4–5, 7–8.) Second, they argue that even if their agents did misappropriate trade secrets, Defendants themselves never possessed or utilized them, and thus Defendants are not vicariously liable for any misappropriation. (*See, e.g.*, *id.* at 7; ASB Reply [195] at 3.) The court considers each argument in turn.

A.    **Merits of Trade Secrets Claims**

1.    **Specificity of Trade Secrets**

Plaintiff brings claims under both the DTSA (a federal statute) and the ITSA (the Illinois version).  The definitions of a trade secret under both statutes are "materially identical," so the court analyzes both in tandem.  *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021).  Under each statute, to establish trade secret misappropriation, a plaintiff must establish that "(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation." *Ocean Tomo, LLC v. PatentRatings, LLC*, 375 F. Supp. 3d 915, 951 (N.D. Ill. 2019); *see also* 18 U.S.C. § 1836(b)(3)(B).

As a threshold matter, in order to establish that trade secrets exist, the plaintiff "must define the allegedly misappropriated secrets with sufficient specificity." *Maxtech Consumer Prods., Ltd. v. Robert Bosch Tool Corp.*, 255 F. Supp. 3d 833, 853 (N.D. Ill. 2017).  The Seventh Circuit has noted that this is an exacting standard—a plaintiff must define claimed trade secrets with a "high level of specificity." *REXA, Inc. v. Chester*, 42 F.4th 652, 663 (7th Cir. 2022).  It is not enough for a plaintiff to simply produce "long lists of general areas of information which contain unidentified trade secrets." *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 672 (N.D. Ill. 1997) (citation and internal quotation marks omitted).  Because an "amorphous and unsupported trade secret is no trade secret at all," *Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, No. 17-CV-5826, 2023 WL 5334638, at *17 (N.D. Ill. Aug. 18, 2023), it is the plaintiff's responsibility to present sufficient information from which the described trade secrets can be reasonably ascertained and analyzed. *See IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) (declining to independently review lengthy documents to search for cognizable trade secrets).

Defendants argue that Bankers Life's definitions of its Compensation, Marketing, and Lead List trade secrets are far too broad; they claim that "Bankers has done nothing but identify broad, general categories of information which contain unidentified trade secrets."  (ASB Reply [195] at

18

6.)  With respect to the Marketing and Compensation secrets, the court agrees.  The extremely broad language that Bankers Life uses to define these secrets makes it impossible to pin down exactly what Bankers qualifies as a trade secret.  Bankers Life defines the Marketing Trade Secrets as

> The internal sales and marketing strategies (referred to herein as the "Marketing Trade Secrets") include information widely considered proprietary and confidential, such as sales manuals, training materials, product information, sales steps, best practices, marketing techniques, and approaches to market penetration, including company-wide and localized plans.

(Opp'n [173] at 7).  Compensation Trade Secrets are described as

> The commission and sales performance information (referred to herein as the ["]Compensation Trade Secrets") includes commission rates, bonus structures, and sales rankings and performance metrics for agents and managers.

(*Id.* at 8.)

These definitions are woefully broad—they include broad swaths of amorphously defined materials, and could easily encompass thousands of documents.  It is not clear whether Bankers Life believes all of these documents are trade secrets, or only a subset.  To the extent that it argues that *all* of the defined documents are protected secrets, that claim is unrealistic—some of the material (such as "product information") is almost certainly publicly available, and thus not secret.  And to the extent that Bankers Life believes only *some* documents within the broadly defined groups are trade secrets, they do not say what those documents are, or make any effort to narrow things down.  There may well be trade secrets within these groups, but Plaintiff's failure to define them with any specificity makes it impossible for the court or a jury to analyze them. Bankers Life does little more than gesture broadly towards a large set of documents while claiming, in essence, that "[e]verything you got from us was a trade secret." *Nilssen*, 963 F. Supp. at 672 (citation omitted).  That is insufficient as a matter of law.  *Rexa*, 42 F.4th at 663 ("When a plaintiff . . . fails to isolate the aspects that are unknown to the trade, no trade secret has been identified.").

Indeed, multiple courts have found similar descriptions of trade secrets—including some that are much more precise than those at issue here—insufficiently specific. Thus, in *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002), the plaintiff, a software company, alleged that employees of a competitor had misappropriated "details about how [plaintiff's] software work[ed]" in violation of Wisconsin trade secrets law.[19] *Id.* at 583. The district court granted summary judgment on the ground that plaintiff had failed to identify the trade secrets with specificity. The Seventh Circuit affirmed, noting that the plaintiff had defined its trade secrets by way of a "43–page description of the methods and processes underlying" the software at issue. *Id.* This description was too vague; while the document probably did include some trade secrets, it also included other information (such as the "appearance of data-entry screens") that was "readily ascertainable" to those in the industry. *Id.* at 584. The plaintiff's failure to "separate the trade secrets" from the other information was fatal to its claim, as the court could not evaluate the merits of a plaintiff's misappropriation claim without knowing precisely what those trade secrets are. *Id.*

The same is true here. Bankers Life has simply described a wealth of material and invited the court to "hunt through the details in search of items meeting the statutory definition." *Id.* The court declines that invitation, and finds that summary judgment is warranted as to the Marketing and Compensation Trade Secrets.[20] *See GlobalTap LLC v. Elkay Mfg. Co.*, No. 13 C 632, 2015

---

[19]   The Wisconsin Uniform Trade Secrets Act ("WUTSA"), like the ITSA, defines trade secret using the same elements as the DTSA. *Presidio Holdings Inc. v. People Driven Tech., Inc.*, No. 1:24-CV-02912, 2025 WL 947946, at *5 (N.D. Ill. Mar. 30, 2025) (noting that the DTSA, ITSA, and WUTSA are "essentially the same").

[20]   The court notes that in *Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, No. 17-CV-5826, 2023 WL 5334638 (N.D. Ill. Aug. 18, 2023), Judge Seeger found that "commission and sales statements" from an insurance company qualified as trade secrets. Indeed, commission reports can be protected trade secrets, as such information could enable a rival to identify top-performing agents to target for recruitment. *See, e.g., id.* at *15. But the plaintiff in *Allstate* clearly described, with specificity, the two precise reports that were alleged to have been misappropriated. That is not the case here. Without knowing which documents Bankers Life believes were misappropriated, the jury cannot evaluate the assertion that they are trade secrets.

WL 94235 * 7 (N.D. Ill. Jan. 5, 2015) (holding that while there "may well be trade secrets within the 101–page Business Plan," it "was Plaintiff's burden to identify those secrets and it has repeatedly failed to do so"); *Allstate*, 2023 WL 5334638, at *16 ("[T]o the extent that Plaintiffs think that certain portions of the 100-page Supplement are trade secrets, they never identify those parts.").

Bankers Life is on firmer ground, however, in claiming that its Lead Lists constitute a trade secret. Here, Bankers Life has provided a much more precise definition: Lead Lists are "prospect and lead lists" that "are compiled through a combination of third-party data acquisition, proprietary filtering, and internal marketing efforts." (Opp'n [173] at 8.) Defendants argue that these secrets, too, are not defined with specificity, but the court disagrees. Unlike the Marketing and Compensation secrets, the Lead List group is comprised of only one kind of document—a list of sales "leads" (i.e., potential targets) that are used by agents to sell insurance. This definition is specific enough for the court and a jury to determine whether or not said lists were trade secrets. *See Allstate*, 2023 WL 5334638, at *14 ("Customer lists, meaning a business's collection of customer identities, are protectable trade secrets."); *see also* 765 ILCS 1065/2(d) (explicitly identifying a "list of actual or potential customers" as trade secrets).

### 2. Protective Measures

Describing trade secrets with specificity is only one piece of the puzzle, however—Bankers Life must also show that they kept the trade secrets sufficiently secret. Under the DTSA and ITSA, the court considers two factors: (1) the extent to which "the owner thereof has taken reasonable measures to keep such information secret", and (2) whether "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information" 18 U.S.C. § 1839; *see also* 765 ILCS 1065/2(d) (using an essentially identical definition).

21

On the first prong, Defendants argue that Bankers Life's claims are precluded because the company did not act "to keep the information secret." (*E.g.*, Key Br. [157] at 7–8.) They point to the fact that the alleged secrets can be accessed by all of Banker Life's many agents, that the company has "no system in place to ensure that every terminated employee returns information that they may have access to in printed form," and that Bankers Life does not take zealous efforts to ensure that departing employees return secret documents. (*Id.*)

The court sees things differently. While a plaintiff must show measures that it has taken to protect its secrets, a "company need not monitor its employees like a police state to garner trade secret protection for its confidential information." *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1137 (N.D. Ill. 2019), *abrogated on other grounds*, *DM Trans, LLC v. Scott*, 38 F.4th 608, 621 (7th Cir. 2022). And, because the "reasonableness of a given confidentiality measure requires a fact-based inquiry dependent on the specific circumstances," *Sonrai Sys., LLC v. Waste Connections, Inc*., 658 F. Supp. 3d 604, 615 (N.D. Ill. 2023), whether "measures are reasonable in a given [trade secret] case is an issue for a jury." *Tax Track Sys. Corp. v. New Investor World, Inc*., 478 F.3d 783, 787 (7th Cir. 2007). As a result, a "plaintiff rarely loses on a misappropriation claim because of the 'reasonable measures' element." *Allstate*, 2023 WL 5334638, at *20. The evidence here suggests that Bankers Life kept its secrets protected by passwords, employed role-based access controls, regularly monitored its systems for suspicious downloads, and trained its employees on document confidentiality, among other things. This is ample evidence from which a reasonable juror could find that adequate protective measures were taken.

The second prong requires the Plaintiff to show that the alleged secrets derive economic value from their secrecy. 18 U.S.C. § 1839(3)(B); *see also* 765 ILCS 1065/2(d)(1). On this point, Defendants argue that Bankers Life's consumer lists, lead lists, and price lists are "well-known and easily obtainable" and thus not a trade secret. (ASB Reply [195] at 7–8.) The court, again, sees disputes of fact on this issue.

22

As to consumer and lead lists, the evidence here, taken in the light most favorable to Bankers Life, suggests that Bankers Life's lists are not rote lists of target customers. Rather, they are *compilations* that combine customer identity with other sensitive information gathered by Bankers Life, including the nuances of an individual's insurance policies, their personal goals and concerns, and "other personal information relevant to insurance purchase decisions." (Opp'n [173] at 21.) The independent economic value from these compilations is obvious: Bankers Life's competitors can use this sensitive data to identify the individuals most willing to buy particular insurance products, and tailor outreach and sales efforts. For this reason, courts routinely find customer lists that include non-public information or "unique combination[s]" of customer information to be protectable under the trade secret laws. *See, e.g.*, *3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001); *Allstate*, 2023 WL 5334638, at *19 (holding that a compilation "of receptive customers" is a trade secret); *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) ("Trade secrets include customer lists that are not readily ascertainable . . . ." (citation and internal quotation marks omitted)); *cf. GlobalTap*, 2015 WL 94235, at *7 (A list of "obvious sales targets cannot constitute a trade secret."). On the evidence here, a reasonable jury could find that Bankers Life derives economic value from the secrecy of its list.

The same applies to price lists. Defendants argue that price lists cannot be trade secrets because customers are free to share price information with one another. But, again, Bankers Life's price lists include more than "generic rate information." (Opp'n [173] at 7.) There is evidence that these lists include Bankers Life's broader "pricing policies and underwriting guidelines" that contain "information on how policies are priced based on factors such as age and gender, as well as details about non-guaranteed elements and anticipated rate increases." (*Id.*; *see also* PSOF ¶ 8.) A simple list of product prices would probably not be a trade secret, but a

jury could indeed find that a database including information on how those prices are calculated derives economic value from its secrecy.[21]

Thus, the court holds that a reasonable jury could find that Bankers Life's customer lists, lead lists, and price lists qualify as trade secrets under the DTSA and ITSA.

### 3. Misappropriation

Finally, Defendants argue that Bankers Life cannot prove that the departing agents misappropriated trade secrets. They assert that any secrets were "lawfully acquired" within their "normal course of employment" with Bankers Life, and that there is no evidence the "agents actually used this information." (Key Br. [157] at 6.) Again, the court is not convinced.

It is well-established that circumstantial evidence can be used to prove misappropriation of trade secrets. *Lumenate Techs., LP v. Integrated Data Storage, LLC*, 13 C 3767, 2013 WL 5974731, at *5 (N.D. Ill. 2013) (St. Eve, J.) Because it "is frequently true in trade secret cases that misappropriation and misuse can rarely be proved by convincing direct evidence," *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001) (cleaned up), "circumstantial evidence is acceptable, indeed even expected, in trade secret misappropriation cases." *JTH Tax LLC v. Grabowski*, 19 C 8123, 2021 WL 3857794, at *6 (N.D. Ill. 2021) (Kennelly, J.) (citation omitted); *see also Allstate*, 2023 WL 5334638, at *26 (explaining this). To proceed to trial, therefore, Bankers Life need not present direct evidence that the agents used the customer lists at issue. Instead, Bankers Life can survive summary judgment so long as it presents circumstantial evidence sufficient to support a reasonable inference that misappropriation occurred. *RKI*, 177 F. Supp. 2d at 923.

They have met that burden. Evidence in the record suggests that at least some Bankers Life-to-ASB agents downloaded confidential client lists prior to moving to ASB. Mr. McDaniel, a

---

[21] While the language that Bankers Life uses to define its Pricing Trade Secrets is somewhat amorphous, Defendants do not challenge it as non-specific. (*See, e.g.*, ASB Reply [195] at 6 (challenging the specificity of only the Marketing, Compensation, and Lead List Trade Secrets).)

former Bankers Life agent, admitted that he downloaded a substantial amount of Bankers Life client information on the day he resigned from the company, and his explanation (that he retained only his own family's information) may not be compelling to the jury. (McDaniel Dep. [158-43] at 89:18–90:9.) Indeed, a forensic investigation of McDaniel's laptop conducted as a result of a lawsuit filed by Bankers Life revealed that he indeed had policyholder information in his possession. Likewise, the testimony of Mr. Ruddick revealed that he was aware that Bankers Life policyholder information was found on the computers of departing agents (and that at least one agent destroyed evidence[22] during the lawsuit). (Ruddick Dep. [158-37] at 74:18–74:20, 88:5– 88:20.) True, this constellation of evidence does not directly show that the ASB agents at issue used the information to sell insurance policies; but, when considered as a whole, it supports a jury finding that agents misappropriated protected trade secrets.

Bankers Life has also argued for application of the so-called "inevitable disclosure doctrine;" but this argument is less convincing. In short, the inevitable disclosure rule allows a court to enter an injunction prohibiting the misappropriation of trade secrets based solely on a showing that the employee's "new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). The doctrine is based in language in both the DTSA and ITSA that authorizes courts to enjoin the "threatened misappropriation" of trade secrets. *See* 18 U.S.C. § 1836(b)(3)(A)(i); 765 ILCS 1065/3. As the Seventh Circuit explained in *PepsiCo*, the inevitable disclosure doctrine makes sense in the context of injunctive relief; if an employee is moving from Company A to Company B, and the employee will have a role at Company B that will inevitably require her to rely on trade secrets from Company A, an injunction to prevent that inevitable disclosure might well be appropriate. 54 F.3d at 1267–69. But Plaintiff here is invoking it for an entirely different purpose—to survive

---

[22] "Courts often consider a defendant's suspicious downloading of company information before his departure and attempts to 'cover his tracks' in determining whether the defendant misappropriated trade secrets." *Lumenate*, 2013 WL 5974731, at *5 (citing *RKI, Inc.*, 177 F.Supp.2d at 866–68, 875).

summary judgment in an action for *damages*.[23]  To recover damages under either statute, a plaintiff must convince the jury that misappropriation actually happened, and that the plaintiff was damaged by it.  Circumstantial evidence can support a jury finding of actual misappropriation, but the court doubts that a reasonable jury could award damages on a misappropriation claim based solely on the fact that an employee took a similar position with a competitor.  *See Lumenate*, 2013 WL 5974731, at *6 ("The mere fact that a person holds general skills and knowledge acquired during his tenure with his former employer and then assumes a similar position at a competitor does not, without more, make it inevitable that he will use or disclose trade secret information in his new position." (cleaned up)).

But ultimately, the court need not reach that question.  Bankers Life has presented sufficient circumstantial evidence to "construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him" that it has protectable trade secrets.  *Allstate*, 2023 WL 5334638, at *26 (citation omitted).  Summary judgment on this issue is denied.

### B.    Vicarious Liability

Having established that the information at issue could constitute a trade secret, the court turns to which Defendants, if any, can be held liable for misappropriation of that information by agents who have jumped ship.  As noted above, each Defendant vehemently denies responsibility for the actions of their independent contractor agents.  They each adopt a similar variation of the same argument:  that they do not supervise, direct, or control the individual agents operating within the decentralized ASB structure, and thus cannot be held vicariously liable for agents' unlawful conduct.  (*E.g.* ASB Reply [195] at 3–5.)  The court addresses their arguments below.

---

[23]    *Compare* 18 U.S.C. § 1836(b)(3)(A)(i) (authorizing an injunction "to prevent any actual or threatened misappropriation"), *with id.* § 1836(b)(3)(B) (allowing for "damages for actual loss caused by the misappropriation of the trade secret").

### 1.    American Senior Benefits

Despite Defendants' repeated statements otherwise, there is substantial evidence from which a jury could find ASB vicariously liable for its agents' wrongful acts.  It has long been settled that an agent's wrongful conduct is imputed to the principal whenever a principal-agent relationship exists.  *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 591 (7th Cir. 2021) (discussing the "fundamental agency principle that a principal is liable for the wrongful acts of an agent acting within its authority").  The most straightforward way of establishing vicarious liability is via actual authority.  Actual authority requires that, at the time of the agent's conduct, "the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."  RESTATEMENT (THIRD) OF AGENCY § 2.01 (A.L.I. 2006).  To show actual authority, a plaintiff must show "(1) a principal/agent relationship exists, (2) the principal controlled or had the right to control the alleged agent's conduct, and (3) the alleged conduct fell within the scope of the agency."  *Bilek*, 8 F.4th at 587.  A contract that explicitly creates an agency relationship is the most basic example of actual authority.  *Thompson v. Sutherland Glob. Servs., Inc.*, No. 17 C 3607, 2019 WL 1470238, at *7 (N.D. Ill. Apr. 3, 2019).

To put it simply, a reasonable jury could find that ASB's agents sold insurance policies pursuant to actual authority.  To begin, the parties clearly have a principal-agent relationship established by contract.  The text of ASB's Agent Agreement, which was produced by the parties as an exhibit, expressly authorizes the agent to "act as an agent for ASB and to represent ASB" in at least two respects relevant to this case:  selling insurance products, and "recruit[ing] and recommend[ing]" agents.  (Agent Agreement [158-16] at 4.)  And the wrongful acts at issue (misappropriation of trade secrets) occurred to further the sale of insurance policies, so they are clearly within the scope of the principal-agent relationship.

That is not all.  Other evidence in the record suggests that the ties between ASB and its agents are closer than Defendants acknowledge.  A few examples: first, contrary to ASB's disclaimers, ASB's Agent Agreement purports to give ASB the "right to control" agents' conduct,

27

as it explicitly grants ASB the right to set "rules and regulations" governing their activities. (*Id.*) Second, Mr. Sweeney (ASB's co-founder) testified that he had a substantial amount of control over ASB agents, and could decide who was hired, could fire anybody at any time for any reason, and could impose "rules" on agents. (*E.g.*, Sweeney Dep. [158-6] at 49:24.) And third, the deposition testimony of other witnesses suggests that RSMs believe they are part of a broader ASB apparatus (*see* Godfrey Dep. [174-13] at 14:11–14:14, 24:14–25:16.[24]) All of this evidence provides a sufficient basis for a conclusion that ASB is vicariously liable for the misappropriation of trade secrets.

### 2.    Key Retirement Solutions and Heartland Retirement Group

The court turns next to ASB's regional sales managers, Key Retirement Solutions and Heartland Retirement Group. The vicarious liability of these organizations present more difficult questions, solely because their function and purpose within the ASB umbrella is mysterious. It is unclear how RSMs earn revenue; whether they exercise supervision over their agents; what responsibilities they have other than recruiting agents for ASB; and whether they could (if they so wished) prevent their agents from misappropriating trade secrets. While Defendants perfunctorily deny Plaintiff's claims about RSMs' vicarious liability, they never quite explain what an RSM does, leaving the court guessing about Defendants' position on RSMs' role in the broader ASB framework.

From what the court can surmise, it appears that Defendants believe RSMs to be the primary locus of activity within the ASB network. Defendants' submissions suggest that the RSMs are "independent insurance offices" that conduct their own operations (ASB Reply [195] at 3), and that ASB is involved merely as the "marketing arm" of the RSMs (DOSF ¶ 17). Without saying to

---

[24]    Lyn Godfrey is "a national recruiting director employed by Integrity. Godfrey's duties and obligations are to identify and communicate recruiting successes to partners through ASB, to create and train a recruiting team, to create a training manual for recruiting, to coach and train boots-on-the-ground recruiters, and to help ASB recruiters with digital marketing." (Opp'n [173] at 11–12.)

explicitly, Defendants thus suggest that they believe that the RSMs are the true engines of insurance sales within ASB, and that ASB's role is limited. (*See id.* ¶ 48 (suggesting that Heartland and Key are the primary competitors of Bankers); *id.* at ¶¶ 108, 115 (noting that both "hire" agents).) Mr. Sweeney's testimony is consistent with this position: He claims that his supervision over agents is minimal, and repeatedly emphasizes that individual RSMs are primarily responsible for directing agent sales and other revenue-generating operations. (*See* Sweeney Dep. [158-6] at 65:1–65:15 (RSMs interview candidates and choose who to hire); 49:11–49:19 (referring to RSMs as independent companies that choose to "have all of their contracts" under ASB), 60:12–60:24 (explaining that RSMs, and not ASB, direct day-to-day operations of the business). But the testimony of the RSMs suggests the opposite—that RSMs exercise little day-to-day control over the operations of the business. The conflicting statements from Defendants and these witnesses, even without more, supports denying summary judgment.

The court also notes that neither Heartland nor Key have made any serious effort to explain their function in the ASB business structure. For example, the two companies' Reply Briefs do not seriously engage with Bankers Life's assertion that they are vicariously liable for agents' misconduct. Instead, the briefs focus on explaining that their codefendants—ASB and Integrity—are uninvolved in RSM operations. (*See, e.g.*, Heartland Reply [196] at 4 ("Integrity does not participate in the operations of the companies in its distribution network"); *id.* at 4–5 ("ASB does not maintain any ownership in KRS and Heartland, and each operate [sic] separately from ASB.").) These assertions could lend credence to the vicarious liability arguments of ASB and Integrity, but they do not address Bankers Life's claim that the RSMs themselves are also responsible for their agents' misappropriation of trade secrets. (*See generally* Opp'n [173] at 9–13.) This omission is glaring.

But setting aside the murky role of RSMs, there is enough evidence in the record from which a jury could conclude that RSMs are vicariously liable for agents' action by way of ratification. "Ratification is the affirmance of a prior act done by another, whereby the act is given

effect as if done by an agent acting with actual authority." See RESTATEMENT (THIRD) OF AGENCY § 4.01(1) (A.L.I. 2006).  "A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents." *Id.* § 4.01(2).  Ratification requires "that the principal have full knowledge of the facts and the choice to either accept or reject the benefit of the transaction."  *NECA-IBEW Rockford Loc. Union 364 v. A & A Drug Co.*, 736 F.3d 1054, 1059 (7th Cir. 2013) (citation and internal quotation marks omitted).

Bankers Life has presented evidence that Heartland and Key knew, or had reason to know, that their agents were misappropriating the trade secrets of Bankers Life, benefited from said misappropriation, *and did nothing in response*.  (*See generally* Lainson Dep. [158-12]; Ruddick Dep. [158-37].)  This is sufficient to support a jury finding of ratification.[25]  *See ABN AMRO, Inc. v. Cap. Int'l Ltd.*, 595 F. Supp. 2d 805, 822 (N.D. Ill. 2008) ("Like authority, ratification need not be express; it may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an unauthorized transaction." (citation and internal quotation marks omitted)).

### 3. Integrity Marketing Group

Plaintiff has not, however, made a sufficient case for imputing liability to Integrity Marketing Group.  Recall that Integrity is an IMO that has acquired both ASB and Heartland.  Outside of this corporate relationship, the evidence supporting a claim of vicarious liability appears limited to the assertion that Integrity provides "compliance support."  But the fact that Integrity owns two Defendants, and that Integrity provides some support to its subsidiaries, is not sufficient, on its own, to establish vicarious liability.  In addition, unlike Heartland and Key, there is no evidence in

---

[25]      Assuming that the RSMs profit from their agents' sale of insurance policies (a matter that is not clear from the record), the court notes the possibility that the evidence might also support an unjust enrichment claim, even absent a basis for vicarious liability.  Both the DTSA and ITSA allow for recovery of damages based on a party's "unjust enrichment caused by misappropriation" of trade secrets.  *See* 765 ILCS 1065/4(a); 18 U.S.C. § 1836(b)(3)(B)(ii).

the record that Integrity knew (or should have known) about agents' misappropriation of trade secrets, and decided to look the other way and reap the benefits of it. In the absence of this evidence, summary judgment must be granted as to Integrity on the misappropriation claim.

* * * * *

To briefly summarize: Summary judgment is warranted on the misappropriation claim to the extent that such claim is based on the alleged misappropriation of the "Marketing" and "Compensation" Trade Secrets, as described above. Integrity Marketing Group is entitled to summary judgment on the DTSA and ITSA claims. The remaining trade secret claims survive summary judgment and will be submitted to the jury at trial.

### III. Tortious Interference—Count IV

The court turns next to Bankers Life's tortious interference claim. On this point, Plaintiff's claim is straightforward: it argues that Defendants' recruitment of Bankers Life agents induced them to violate their non-solicitation agreements with Bankers Life, constituting tortious interference under Illinois law.

To prevail on a tortious interference with contract claim, a plaintiff must show (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages. *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1156 (N.D. Ill. 2016) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 154–55, 137 Ill.Dec. 19, 25, 545 N.E.2d 672, 676 (1989)). Defendants move for summary judgment on two grounds. First, they argue that Bankers Life's non-solicitation agreements are invalid and unenforceable; second, they contend that Defendants' tortious interference claim is preempted by ITSA. As explained below, neither argument satisfies the court that Defendants are entitled to summary judgment.

## A. Validity of the Restrictive Covenants

According to Defendants, the language of the restrictive covenants at issue in this case reads as follows:

> During the term of this Contract and for 24 months thereafter, within the territory regularly serviced by the branch sales office of the Company where the Agent normally submits business, the Agent shall not, personally or through the efforts of others, induce or attempt to induce:
>
> (a) any agent, Branch Sales Manager, Territory Vice President, employee, consultant or other similar representative of the Company to curtail, resign, or sever a relationship with the Company;
>
> (b) any agent, Branch Sales Manager, Territory Vice President or employee of the Company to contract with or sell insurance business with any company not affiliated with the Company, or
>
> (c) any policyholder of the Company to relinquish, surrender, replace, or lapse any policy issued by the Company.

(DSOF ¶ 53.)[26]

In Illinois, restrictive covenants must be reasonable.  *Aon Risk Servs. Companies, Inc. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 849 (N.D. Ill. 2019).  Because such agreements are "partial restraints on trade," Illinois courts "carefully scrutinize[]" them to ensure that they support a legitimate business interest other than restraining competition.  *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 781 (N.D. Ill. 2011).  Agreements imposing a "reasonable restraint" are valid so long as they are supported by consideration.  *Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 111871, ¶ 16, 965 N.E.2d 393, 396, 358 Ill. Dec. 322, 325 (2011).

---

[26]     In its responsive LR 56.1 statement, Bankers Life objects to the accuracy of this language, claiming that it is not authenticated and questioning whether it is included in the specific employment contracts at issue in this case.  But, inexplicably, Bankers Life—also a signatory to the contracts at issue—has not presented any more accurate version of the agreements.  Instead, in its briefing, Bankers Life engages with Defendants' language as if it is indeed accurate.  The correct language is ultimately not material to the outcome of this summary judgment motion; the court concludes that summary judgment is not warranted even under Defendants' version of the language.  But Bankers Life will need to present the correct language at trial if it wishes to maintain this objection.

Under Illinois law, the validity of restrictive covenants must be examined by applying a "three-dimensional rule of reason."[27]  *Id.* ¶ 24, 965 N.E.2d at 398, 358 Ill. Dec. at 327.  Under this test, non-solicitation agreements are upheld only if "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee . . . (2) does not impose undue hardship on the employee-promisor, and (3) is not injurious to the public." *LKQ Corp. v. Rutledge*, 96 F.4th 977, 981–82 (7th Cir. 2024) (citing *Reliable Fire*, 2011 IL 111871, ¶ 17, 965 N.E.2d 393, 396).  This test is a flexible one, as the Supreme Court explained:

> Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions.  No factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case.

*Reliable Fire*, 2011 IL 111871 ¶ 43, 965 N.E.2d at 404.  Restrictive covenants must also "be narrowly tailored to protect only against activities that threaten the employer's interest." *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 452, 879 N.E.2d 512, 526 (1st Dist. 2007).

Defendants argue that the restrictive covenants are unenforceable because they do not further a "legitimate business interest."  (*E.g.*, ASB Br. [151] at 11.)  Specifically, they contend that Bankers Life has an "unstable workforce," in that it "primarily engages new agents who have no prior sales experience," and that the Bankers Life's products "are not sophisticated or

---

[27]     In their opening briefs, Defendants correctly cite to the controlling case, *Reliable Fire Equip. Co. v. Arredondo*, but misstate its holding on the enforceability of restrictive covenants. Defendants characterize *Reliable Fire* as imposing the following two-pronged test: "a covenant will be enforced if (1) the employee acquired confidential information through his employment and subsequently attempted to use it for his own benefit; (2) and if, by the nature of the business, the customer relationship is near-permanent, and but for his association with plaintiff, defendant would never have had contact with the clients in question."  (ASB Br. [151] at 12–13 (citing *Reliable Fire*, 2011 IL 111871, ¶ 37).)  *Reliable Fire* does describe that test, but does not endorse it.  The test originated in an earlier case, *Nationwide Advertising Service, Inc. v. Kolar*, 14 Ill.App.3d 522, 302 N.E.2d 734 (1st Dist. 1973).  In the paragraphs following the cited portion, *Reliable Fire* explicitly rejects the two-pronged *Kolar* test and the quoted language.   In their Reply Briefs, Defendants appear to acknowledge that their prior arguments were based on the wrong legal standard, and state the correct test.  (*See, e.g.*, ASB Reply [195] at 15.)

complicated, and do not require extensive education, skill, or training to understand." (*Id.*)  In Defendants' view, these factors mean that Bankers Life's interest in stability is "more aspirational than actual," and the restrictive covenants are, therefore, overly broad.  (*Id.* at 12.)  Bankers Life responds that Defendants' arguments sweep too broadly.  Bankers Life asserts that invalidating the company's employment contracts as facially invalid in a collateral matter would be premature, as reasonableness is a highly fact-dependent inquiry.  (Opp'n [173] at 32–33.)  They also note that the average Bankers Life customer is with the company for nine years, and argue that the 24-month restrictions on solicitation are reasonable in this context.  (*Id.* at 33.)  As a fallback argument, Bankers Life argues that ASB's own agent agreements include materially identical language.  (*See id.* at 34–35.).

Bankers Life has the better of the argument.[28]  It appears that the company does have a somewhat unstable workforce, but workforce instability arguably enhances the firm's need to seek stability via non-inducement provisions in its employment contracts.  *Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1013–14 (N.D. Ill. 2014), *aff'd*, 793 F.3d 748 (7th Cir. 2015) ("[M]aintaining stability within an employer's workforce can be a legitimate business interest and thus the basis for a restrictive covenant.").  In fact, because restrictive covenants must be "no greater than necessary to protect the interests at stake," if Bankers Life *did* have a stable workforce, the restrictions might be overbroad and unenforceable.  *Instant Tech.*, 40 F. Supp. 3d at 1013.  Aside from workplace stability, the provisions support other legitimate goals as well, like

---

[28]     Defendants appear only to challenge the validity of subsections (a) and (b) of this agreement, not subsection (c).  Subsection (c) prevents departing agents from soliciting Bankers Life policyholders.  But since Defendants' arguments are based on the stability of Bankers Life's *employees*, they do not apply to a provision intended to protect *policyholder* stability.  If the evidence at trial shows that Plaintiff's tortious interference claims are based entirely on violations of subsection (c), Defendants may raise arguments as to its validity in an appropriate post-trial motion.  The court notes, however, that such non-solicitation agreements are typically found to be reasonable, if they are narrowly tailored.  See *Aon PLC v. Alpine Rewards, LLC*, No. 22-CV-4762, 2023 WL 3713987, at *6–8 (N.D. Ill. Apr. 12, 2023) (noting that, in Illinois, "non-solicitation covenants are usually justified on the ground that the employer has a legitimate business interest in restraining the employee from appropriating . . . customer relationships." (cleaned up)).

reducing recruitment expenses and protecting investments in employee training. Notably, Bankers Life's agreements do not prevent employees from working for competitors; they only prevent departing employees from inducing coworkers to leave with them. Such a restraint is reasonable, does not present an undue burden on the employee, and is not injurious to the public. *See LKQ Corp*, 96 F.4th at 981–82. It is valid under Illinois law.[29]

In support of their argument, Defendants primarily rely on Magistrate Judge Cole's opinion in *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765 (N.D. Ill. 2011). That case concerns two multi-level marketing ("MLM") companies: Pampered Chef, which sells kitchenware, and Jewels by Park Lane, which sells jewelry.[30] *Id.* at 769–70. Several of Pampered Chef's "Directors"— higher-level employees in its "pyramidal sales structure"—left the company to join Park Lane, and induced the "consultants" underneath them to do the same, in apparent violation of their non-solicitation contracts. *Id.* at 770. Pampered Chef sued these individuals, seeking a preliminary injunction. *Id.*

In denying the injunction, the court concluded that Pampered Chef had not made a showing that it was likely to prevail on its claim that its contracts were valid and enforceable. Pampered Chef justified its restrictive covenants by pointing towards its need to protect a stable workforce, but the court questioned that rationale, noting that Pampered Chef's workforce was inherently unstable. As an MLM firm, Pampered Chef had "nearly 60,000 at-will salespeople who come and go annually with metronomic regularity." *Id.* at 787. These salespeople received no

---

[29] In the alternative, Defendants argue that "the restrictive covenant is not enforceable to the extent Bankers is claiming a legitimate business interest in its client list as confidential information." (ASB Br. [151] at 12.) Because the court finds that Bankers Life's interest in a stable workforce supports their non-solicitation agreement, the court need not address arguments as to other legitimate business interests.

[30] An MLM firm is one that has "a business structure or practice in which an individual seller earns commissions both from direct sales and from the sales of the seller's recruits, of those recruited by the seller's recruits, and so on." *See Multi-Level Marketing*, Merriam-Webster Dict.), https://www.merriam-webster.com/dictionary/multi-level%20marketing ((last accessed Jan. 23, 2026).

"highly specialized training," nor did their jobs require specialized skills, education, or experience, casting doubt on the question of whether Pampered Chef truly had a legitimate, non-aspirational interest in workforce stability. *See id.* at 786–87.

Defendants assert that the restrictive covenants at issue here are unenforceable for the same reasons, but the court disagrees. The *Pampered Chef* case is not controlling, and even aside from the fact that it arose in a much different procedural posture, is distinguishable. In MLM firms, like Pampered Chef, a consultant's success (particularly at higher levels in the company) is often dictated by how well he or she can recruit others and build "an organization beneath them." *Id.* at 796–97. Because recruiting is an inherent part of the job, a ban on solicitation can effectively prevent a consultant from moving to a competitor. This is especially true given that most people have a limited network of friends and family that they might be able to solicit—if a given consultant's network has already joined them at Pampered Chef, that consultant would be unable to move to Park Lane because they would have nobody left to recruit. *See id.* at 797. The same is not true at Bankers Life. Bankers Life is not an MLM firm, and the recruitment of other agents does not appear to be a major factor (if a factor at all) in salespeople's jobs, so non-solicitation agreements do not effectively prevent its agents from going to work for a competitor.[31]

Defendants also cite to an oral decision by Judge Pamela Myerson of Cook County Circuit Court, arguing that it supports their case. (Key Mem. [157] at 11.) Defendants claim that Judge Myerson orally found that Bankers Life's interest in workplace stability was unrealistic, and its "restrictions were broader than necessary and therefore unenforceable" as a result. (*Id.*) In support, they attach an oral transcript of a proceeding—this transcript appears to show Judge

---

[31]       *Pampered Chef* is also distinguishable because Bankers Life appears to invest a substantial amount of money in training its employees. Restrictive covenants can protect that investment by reducing employee turnover. (See Goldberg Dep. [217] at 26:9–26:19, 68:17–69:19.) MLMs are different—consultants typically must pay to join the organization, and the amount spent on employee training is negligible. For example, Judge Cole noted that Pampered Chef spent only about $34 per employee. *Pampered Chef*, 804 F. Supp. 2d at 789.

Myerson denying Bankers Life a preliminary injunction on the grounds that Bankers Life had failed to show that it had an "actual," rather than "aspirational," in interest in workforce stability. (Tr. [158-32] at 615:4–616:10.) The unpublished ruling does not constitute controlling authority; and denying a preliminary injunction is "significantly different" than denying final relief on the merits. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 393, 101 S.Ct. 1830, 1833 (1981).[32]

### B.    Preemption

Defendants next argue that summary judgment is warranted because the tortious interference claim is preempted by the ITSA, which expressly displaces state tort law remedies based on the misappropriation of trade secrets. But Defendants' argument is based on a misunderstanding of Bankers Life's claims. Bankers Life is not basing its tortious interference claim on the theft of trade secrets; instead, it is based on Defendants' allegedly improper solicitation of employees. The claim is thus not preempted. *See Lab. Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 410 (N.D. Ill. 2001) (holding that that "plaintiff's allegations that [defendant] employed the former employees . . . are not preempted to the extent those allegations do not rely on misappropriation of trade secrets").

\* \* \* \* \*

Bankers Life has a legitimate interest in maintaining a stable workforce, so its restrictive covenants appear to be valid under Illinois law. And because the tortious interference claim is based on breach of contract, it is not preempted by the ITSA. Defendants bring no further challenge to the tortious interference claim. Summary judgment is denied on Count IV.

---

[32]    Plaintiff notes in its LR 56.1 statement that Defendants have not explained "what contract [Judge Myerson] was analyzing, whether that is the same contract at issue in this case, or in what context the court was analyzing that contract." (Pl. Resp. to DSOF ¶ 70.) The objection is a puzzling one, as Bankers Life was a party to that earlier lawsuit and surely knows what contract was at issue. The court sees no need for further comment on this issue.

## IV.     Civil Conspiracy—Count V

Finally, the court turns to Bankers Life's civil conspiracy claim.  Defendants argue that (1) Bankers Life has not offered evidence sufficient for a jury to find that an agreement exists, and (2) the civil conspiracy claim should be dismissed as duplicative of the underlying charge.

Bankers Life has made no response at all to this argument.  (*See generally* Opp'n [173].) At summary judgment, it is the burden of the non-moving party to put forth evidence "of specific facts creating a genuine dispute" of material fact.  *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).  It is well-established "that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'" *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 389 (7th Cir.2012) (quoting *Liberles v. Cook Cnty.*, 709 F.2d 1122, 1126 (7th Cir.1983)).  The court cannot—and should not—comb through the record to locate evidence that might support a civil conspiracy claim.  Thus, because Bankers does not oppose this argument, the court finds that it is waived, and summary judgment is granted on Count V.[33]  *See Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . .  results in waiver.").

---

[33]     The court notes that even if Plaintiff had engaged with Defendants' argument on this point, it would be unlikely to succeed.  To the extent that the civil conspiracy claim was based on trade secret misappropriation, it is likely preempted by the ITSA.

## **CONCLUSION**

Summary judgment is granted in favor of Defendants on Count V (civil conspiracy). On Counts I and II (misappropriation of trade secrets), summary judgment is granted with respect to Defendant Integrity in full, and to all other defendants to the limited extent that those claims rely on the alleged misappropriation of the so-called "Marketing" and "Compensation" trade secrets. Plaintiff may proceed on misappropriation claims based on consumer, pricing, and lead lists, against Defendants Key, Heartland, and ASB, as explained herein. Each Defendants' summary judgment motion [150, 152, 154, 156] is denied in all other respects.

ENTER:

Dated: January 23, 2026

REBECCA R. PALLMEYER
United States District Judge