**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **BANKERS LIFE AND CASUALTY COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 22 C 50009** |
| **AMERICAN SENIOR BENEFITS, LLC, INTEGRITY MARKETING GROUP, LLC, KEY RETIREMENT SOLUTIONS, INC., and HEARTLAND RETIREMENT GROUP,** | ) | **Judge Rebecca R. Pallmeyer** |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The parties to this case are competitors in the business of providing insurance to senior citizens. They have also been embroiled for years in a trade secret dispute. Plaintiff Bankers Life and Casualty Company ("Bankers" or "Bankers Life") is a "captive" insurance company, meaning Bankers agents predominantly sell Bankers policies to customers. Defendant American Senior Benefits ("ASB"), on the other hand, is an independent marketing organization ("IMO")—instead of developing its own insurance policies, ASB sells insurance products from third party companies through a large network of ostensibly independent agents. ASB operates using a pyramidal, tiered structure: agents are affiliated with companies that ASB calls "Regional Sales Managers" ("RSMs" or "managers"), who can provide additional resources, such as training, to the agents in their "downline." Two RSMs—Heartland Retirement Group ("Heartland"), and Key Retirement Solutions ("Key")—are, with ASB, Defendants in this case.

For many years, Bankers Life has experienced high turnover of its agents. Many have departed for ASB, Heartland, and Key. Bankers believes that many of these agents took with them confidential client lists, which were then used to "roll" Bankers' policyholders to ASB. Years of dispute and an earlier lawsuit were—on paper, at least—brought to an end in 2018 when the parties agreed to a written protocol to protect Bankers from misuse of its confidential information.

But Bankers Life contends ASB promptly breached that agreement. Bankers filed this lawsuit in 2022, accusing Defendants of being complicit in agents' theft of trade secrets and rolling of Bankers' business.[1] After the court denied Defendants' motions for summary judgment, the court heard testimony and argument over the course of a lengthy bench trial in March and April 2026.

In the paragraphs below, the court lays out its findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a).[2]

**FINDINGS OF FACT**

The findings of fact laid out below are taken from the parties' respective post-trial briefs [288, 289], and the testimony and evidence at trial. These findings are also based on matters subject to judicial notice and the court's credibility determinations after viewing live testimony. All findings are supported by a preponderance of the evidence.

## I. The Parties

Bankers Life and ASB—as well as ASB's affiliated co-defendants—compete in the business of selling insurance products to individuals, particularly senior citizens. Both operate using different business models: Bankers Life uses a traditional, centralized model, whereas ASB operates in a decentralized fashion, through smaller entities (the Regional Sales Managers) that in turn employ individual agents. The court explained the distinction in its prior summary judgment opinion:

> [Bankers Life] is a so-called "captive" insurance company, meaning that it operates using a more traditional business model in which Bankers Life agents primarily sell Bankers Life policies directly to customers. American Senior Benefits, on the other hand, is an "independent marketing organization" ("IMO") that does not itself develop or sell insurance policies. Instead, ASB negotiates with hundreds of third-

---

[1] Federal jurisdiction over this case is proper because one claim was brought under the Defend Trade Secrets Act ("DTSA"), a federal statute. Jurisdiction over the remaining claims is proper under the court's supplemental jurisdiction. *See* 28 U.S.C. § 1367. Both parties agree that Illinois law provides the substantive rule of decision for all state law claims.

[2] The complex nature of this case requires some merging of factual findings and legal conclusions in order to produce a coherent written opinion. The court's decision to discuss factual findings in the "Conclusions of Law" section, and vice versa, is not intended to definitively characterize them as such.

> party insurance providers (such as Blue Cross Blue Shield) to obtain favorable pricing, and then enables its affiliated agents (who are contractors, not employees, of ASB) to sell the third-party companies' policies to customers. This structure, according to ASB, enables "its policyholders to get favorable pricing." Like Bankers Life, ASB's primary focus is on selling insurance policies designed for seniors—including Medicare supplement insurance, annuities, and life insurance—and the company's agents compete with Bankers Life's agents for those customers.

M.S.J. Opinion [226], *Bankers Life & Cas. Co. v. Am. Senior Benefits, LLC*, No. 22 C 50009, 2026 WL 184554 (N.D. Ill. Jan. 23, 2026) (internal citations omitted). As Matthew Ruddick, the owner of Defendant Key, explained at trial, this structure offers great benefits to insurance salespeople: it allows them to enjoy the many advantages of being independent, while also allowing them to take advantage of ASB's bargaining power and ability to negotiate with a wide variety of carriers. As he explained, carriers often restrict the ability of small insurance companies to sell their products, making affiliation with an IMO valuable:

> [T]he big ones you might be familiar with are Aetna or Athene or Humana. With me being a smaller company in the eyes of the insurance world, going and contracting with them, either one, they won't give me a contract. They won't give me a direct contract. Or if they do, the amount of compensation that they're going to offer me for the size of company I am is going to be much lower than what I'm able to obtain by working with an IMO or an insurance marketing organization like ASB and Integrity. So that's the reason why companies like myself would contract through bigger entities, so that we're allowed to get -- so we're able to get at -- get better contracts, bigger contracts, and in fact more contracts.
>
> Like I said, if I was to try to go out with myself just independently, there's a number of contracts and a number of companies I wouldn't be able to obtain. Athene, for example, you've got to have $500 million in annuity business on an annual basis for Athene to give you a direct contract. My company only does about 50 or 60 million. So I would never even be able to contract with Athene without going through another insurance marketing organization like American Senior Benefits.

(Trial Tr., Vol. 4 [278] (Ruddick) at 623:4–624:6.)

ASB is led by Jim Sweeney and his business partner Clay LeGeyt. (Defs. Tr. Br. [289] ¶¶ 29–31.) ASB's structure is largely pyramidal, and quite complex. It is made up of several (at

least nine) "levels" of agents,[3] at least some of whom[4] are affiliated with other companies that ASB refers to as "regional sales managers." (Trial Tr., Vol. 4 [278] (Ruddick) at 627:12–628:11.) Two of these RSMs are Defendants Heartland and Key, which are operated by Tyler Lainson and Matthew Ruddick, respectively. (Defs. Tr. Br. [289] ¶¶ 3, 4.) Within the ASB apparatus, RSMs recruit other agents who then join ASB as part of the RSM's "downline." (*Id.*) Because an RSM retains a portion of the commissions earned by downline agents (Trial Tr., Vol. 4 [278] (Ruddick) at 628:24–629:9), RSMs are highly incentivized to recruit productive agents to their downlines. RSMs can be organized as independent businesses—Key, for example, is a corporation held entirely by Mr. Ruddick. (*Id.* at 624:7–15.) After an agent affiliated with ASB sells an insurance product to a consumer, the insurance carrier "remit[s] commission statement to ASB," and ASB then calculates the commission due to the agent and the RSM.[5] (Defs. Tr. Br. [289] ¶ 24; *see also* Trial Tr., Vol. 4 [278] (Ruddick) at 688:10–16.)

The nature of the relationship between a manager and its downline agents varies quite significantly based on the RSM. ASB imposes few restrictions on RSMs, and managers are afforded broad discretion in choosing how and whether to support their downline agents. (Defs. Tr. Br. [289] ¶ 18.) Some managers entice agents to join their downline by offering perks—including training, marketing, office space, back-office support, and incentives—but there does

---

[3] ASB also has "many half-levels" and at least one "quarter level." (Trial Tr., Vol. 5 [279] (J. Sweeney) at 898:5–18.)

[4] It is not clear whether ASB agents are required to be affiliated with an RSM—Ruddick testified that he started out "just being a regular independent agent" when he moved from Bankers to ASB, implying that at least some agents can contract with ASB while remaining unaffiliated. (Trial Tr., Vol. 4 [278] (Ruddick) at 627:11–20.)

[5] There is some dispute as to who, exactly, pays agent commissions. Ruddick's testimony is inconsistent in this regard: he testified that Integrity pays his agents (Trial Tr., Vol. 4 [278] (Ruddick) at 590:7–591:8), but later said that ASB pays his agents (*id.* at 688:1–689:9). Sweeney suggested that ASB pays the agents (Trial Tr., Vol. 5 [279] (J. Sweeney) at 898:19–899:5), as did ASB Chief of Operations Valarie Jewett (Trial Tr., Vol. 5 [279] (Jewett) at 1014:11, 1025:14–21).

not appear to be any requirement that RSMs do so. (*E.g.*, Trial Tr., Vol. 4 [278] (Ruddick) at 629:11–630:15.) And, notably, RSMs are also allowed to contract with other IMOs in addition to ASB. (Defs. Tr. Br. [289] ¶ 22.) This is not to say there are no restrictions on manager activities. All RSMs must sign an "RSM Agreement" with ASB that imposes certain restrictions—RSMs cannot "rebate premiums on commissions," for example, or "advertise or publish anything concerning [ASB] or its products." (Trial Tr., Vol. 4 [278] (Ruddick) at 607:4–608:6.) But managers, for the most part, enjoy broad discretion in their day-to-day activities and managing their downline agents.

All agents affiliated with ASB, including those in RSM downlines, must also sign a contract with ASB. This "Agent Agreement" states that the "relationship of Agent and ASB shall be that of an independent-contractor relationship, and nothing herein shall be construed to create the relationship of employee and employer, partners or co-venturers." (*See* Pl. Ex. 42 [158-15] ¶ 1.) But the Agreement authorizes ASB agents to act "as an agent for [ASB] and to represent [ASB] in promoting, soliciting sales of, and selling designated products" offered by ASB. (*See also* Pl. Tr. Br. [288] ¶ 3.) The Agreement also sets requirements for agents: they are required to meet a minimum production quota, adhere to certain bookkeeping requirements, protect ASB's trade secrets (including ASB's customer and client lists), refrain from soliciting ASB policyholders to switch carriers for a two-year period following the agent's departure from ASB, and comply with other "rules and regulations as such may be amended from time to time." (*Id.* ¶¶ 1–9.)

There is one additional player in this complicated arrangement: Defendant Integrity Marketing Group, LLC. Integrity is a "private holding company" that acquired ASB in 2019. (Defs. Tr. Br. [289] ¶ 25.) Despite this, both Mr. Sweeney and Mr. LeGeyt remain in charge of all of ASB's day-to-day, operational management, and Integrity's involvement is limited to "providing shared 'back office' corporate services and products, including HR, technology platforms, and financial reporting." (*Id.* ¶ 27.) The evidence at trial on Integrity's activities was minimal; it

appears that the company is largely uninvolved in the day-to-day activities of ASB or any of its other subsidiaries.

## II. Departing Agents and the Protocol

Bankers Life and ASB fiercely compete with one another not just in selling insurance, but also in recruiting effective salespeople. As noted, Bankers Life is a captive insurance company, meaning all Bankers Life agents are "exclusive" to Bankers Life, and can only sell Bankers Life policies. (Trial Tr., Vol. 2 [276] (Goldberg) at 60:10–61:13.) Bankers Life recruits entry-level persons to work as its salespeople; many find the work difficult or not to their liking, and Bankers Life has great difficulty retaining sales agents. Bankers Life's President, Scott Goldberg, acknowledged during his trial testimony that the company makes contact with "over one million" prospects each year in order to recruit "5,000–6,000 licensed agents." (Defs. Tr. Br. [289] ¶ 39.) For those new agents it does bring in, the company invests heavily in training, particularly among career-changers who are new to insurance sales. (Trial Tr., Vol. 2 [276] (Goldberg) at 61:4–61:13.) This process is lengthy and expensive, and it can take a significant amount of time and money to train an agent up to the point where they become productive for Bankers Life. (*Id.* at 63:1–23.) In addition to training, Bankers also has invested in resources to attract agents, including intellectual property and so-called "lead lists" of potential sales targets. (*Id.* at 62:1–16; *see also* Trial Tr., Vol. 2 [276] (Richardson) at 176:4–6.)

Despite the training effort, the vast majority of new agents quickly depart Bankers Life. Only one in five agents remains at Bankers after one year, some choosing to leave the insurance business and others departing for ASB and other independent organizations. (Trial Tr., Vol. 2 [276] (Goldberg) at 62:10–23.) The reason for this turnover is not entirely clear, but Mr. Goldberg suggests that ASB and other IMOs choose to recruit already-trained agents from captive companies, thus saving the expense of training agents and bringing them up to a productive level. (*Id.* at 64:4–19.) Bankers believes that the IMOs, including ASB, are engaged in "aggressive"

targeting and poaching of Bankers Life agents, thus free-riding on the investment that Bankers has made in training new agents. As Mr. Goldberg testified at trial:

> You know, we're -- you know, we are doing the heavy lifting for the industry. A lot of -- you know, as I said, there's -- over the last couple of decades, a number of carriers have abandoned agency building because of the time and expense. And a number of independent agencies have developed, a lot of it fueled by private equity and other investments, so they've been become very aggressive. And instead of doing the hard work that we're doing, they'd much rather, much rather, simply recruit experienced, licensed people. I mean, we're doing all the planting. You know, we're the farmers out there, spending years to grow a tree. These others are coming in and picking the fruit.

(*Id.* at 64:8–19.)

To protect the fruits of its training effort, Bankers Life's Agent Agreements include a number of restrictions on what agents can do when they depart Bankers. They cannot, for example, take with them any "Company Confidential Information," which includes "PII and all other information related to prospects, applicants, and past and present insurance customers." (Pl. Tr. Br. [288] ¶ 52.) They also cannot, for two years following their departure, solicit any Bankers employee to leave Bankers or any Bankers "policyholder to terminate their business with Bankers." (*Id.* ¶ 53.)

These restrictions were violated on numerous occasions by individuals who moved from Bankers Life to ASB. The trial evidence showed that several Bankers-to-ASB agents contacted their former colleagues at Bankers and recruited those colleagues to join them at ASB, in violation of their non-solicitation covenants with Bankers. (*E.g. id.* ¶ 55.) Moreover, many of these departing Bankers agents downloaded lists of their clients and policyholders that they could then use to solicit—or "roll"—business from Bankers to ASB, also a violation of their Agent Agreements with Bankers. (*Id.* ¶¶ 54–61.) In response, Bankers Life sued many of its former agents, and in 2015, Bankers Life brought a lawsuit against ASB itself in the Circuit Court of Cook County. (*Id.* ¶ 74); *see also* M.S.J. Opinion, 2026 WL 184554, at *4 n.9.

In 2018, the two companies sought to end this protracted litigation by entering into a settlement agreement, which includes a provision the parties refer to as "the Protocol." *See*

*generally id.* at *4–5 (explaining the agreement's background). The Protocol [158-44] includes a number of requirements relating to ASB's recruitment of former Bankers Life agents. Most prominently, the Protocol requires ASB, before "appointing or hiring any person," to ask "if they are a current or former [Bankers Life] agent or employee." (Protocol [158-44] § I.A.) If so, and if the prospective agent left Bankers Life within the previous two years, ASB agreed to take the following actions:

> (1) Require the prospective agent to give a one-week written notice to Bankers Life, and provide ASB with a written copy of said notice (*id*. § I.C.1–3);
> (2) Advise the agent, in writing, "not to breach their Agent Agreements with BLC, including, without limitation, the confidentiality, non-disclosure, customer non-solicitation and agent/employee non-recruitment provisions contained in their Agent Agreements" (*id*. § I.C.4);
> (3) Inform Bankers Life directly whenever it "engages or hires a current or former BLC agent or employee if that person has left BLC within the prior 24 months and is still subject to a restrictive covenant" (*id*. § II.A); and
> (4) Advise the prospective agent that "they [are] required to adhere to the terms of their Agent Agreements until such time [as] the restrictive covenants are no longer applicable." (*Id.* § II.B.)

(*See* Pl. Tr. Br. [288] ¶¶ 40–44.) The Protocol also includes a provision on how to proceed when ASB "becomes aware" of a violation by its agents. In such situations, the Protocol directs ASB to:

> (1) Instruct the new ASB Appointee [to cease the prohibited conduct and].
>
> (2) Either end the relationship with the individual and immediately notify [Bankers Life], or invoke [the] exhaustion of remedies protocol.
>
> a. In the event that ASB invokes the exhaustion of remedies protocol, ASB shall identify the facts and particularities of the individual's alleged breach and provide same to [Bankers Life].
>
> b. If the individual's breach is material, and not readily remediable, ASB will terminate the relationship with the individual.

(Protocol [158-44] § II.C.) The "exhaustion of remedies" provision requires the non-breaching party to offer an opportunity to cure, and requires both parties to submit to third-party mediation prior to commencing litigation against the agent. (*Id.* § III.) The Protocol was in force for five years, from 2018 to 2023. (Pl. Tr. Br. [288] ¶ 42.)

## III. Subsequent Violations and Defendants' Inaction

Unfortunately, the Protocol did not end the parties' disputes. There was overwhelming evidence at trial that ASB's compliance with the Protocol was lackluster, at best. The company implemented it by requiring agents to complete a questionnaire the parties refer to as the "Protocol Survey": a series of questions that every new ASB agent must answer, in ASB's "contracting portal," prior to being onboarded with the company. (Defs. Tr. Br. [289] ¶ 33.) This questionnaire asked agents to describe (1) whether they had given Bankers Life the 7-day notice required by the Protocol; (2) whether they had any written agreements with Bankers' Life; (3) whether they are subject to restrictive covenants with Bankers Life; and (4) whether they possessed Bankers' confidential information. (*Id.* ¶¶ 33–34.) If an agent reported being in possession of Bankers' information, ASB sent a "trigger letter" to the agent instructing them to return or destroy that information. (*Id.* ¶ 34.) ASB sent approximately 25 letters to new agents during the Protocol's term. (*Id.*)

But numerous agents left Bankers Life for ASB without providing the 7-day notice required by the Protocol, and ASB made little to no effort to require them to do so. ASB appears to have relied heavily on agents' responses to the Protocol Survey, but agents frequently gave false answers to the Survey questions. For example, Stephanie Burling, an agent who once worked at Bankers Life's Orland Park, Illinois office, resigned from Bankers on August 1, 2022, effective that same day. (Pl. Ex. 12 [303] at 16.) She joined ASB just one day later, on August 2, 2022, and completed the Protocol Survey. (Trial Tr., Vol. 2 [276] (Richardson) at 195:11–196:14.) The Survey asked her the following question: "[H]ave you already provided or do you agree to provide Bankers Life & Casualty seven days' written notice prior to separating from Bankers Life and joining ASB?" She answered "Yes"—an answer that was obviously false, as she had resigned the day before with no advance notice. (JX4 [310] at 20.) While it is not entirely clear that ASB affirmatively knew that this answer was false, it certainly should have known. As Nathan Richardson, Bankers Life's Senior Vice President of Sales, explained at trial, ASB would have

known that Ms. Burling's answers were false had it obtained a copy of Burling's written notice to Bankers Life, as required by § I.C.1–3 of the Protocol, and checked the dates. (Trial Tr., Vol. 2 [276] (Richardson) at 196:24–197:8.) Thus, ASB either did not obtain a copy of the notice, or ignored it—either way, ASB violated the plain language of the Protocol.[6] (Pl. Tr. Br. [288] ¶ 43.)

Ms. Burling's situation was not isolated. The evidence at trial showed that at least 9 Bankers Life agents joined ASB without providing the 7-day notice required by the Protocol.[7] ASB took no action against these agents, nor did it invoke the "exhaustion of remedies" provision of the Protocol. (*Id.*) And some of these agents downloaded lists of Bankers Life policyholders immediately prior to their departure, suggesting that they intended to "roll" business from Bankers to ASB. Christian McDaniel, for example, was an agent at Bankers Life's office in Brentwood, Tennessee, until he resigned effective immediately on March 1, 2021. (Trial Tr., Vol. 2 [276] (Pattee) at 254:14–19.) On the day that he resigned, McDaniel downloaded "955 records of policyholders' information, all of his clients and serving clients, and then also looked up an additional 1,001 records of Bankers' clients, with their products and all their information." (*Id.* at 256:11–15.) He then moved to ASB, and signed ASB's Agent Agreement on March 9, 2021. McDaniel completed ASB's Protocol Survey and, like Burling, lied when asked whether he had

[6] It appears that ASB relied on its RSMs to "collect the notices from the prospective agents who were leaving Bankers to join ASB." (Trial Tr., Vol. 5 [279] (J. Sweeney) at 940:3–5.) This reliance, however well-intentioned, was misguided. It is also somewhat ironic that ASB argues that it has no right to control agents or RSMs, while simultaneously contending that it delegated its own contractual obligations to those agents and RSMs.

[7] In addition to Burling and McDaniel, ASB also violated the 7-day notice provision with respect to the resignations of Constantine Darsaklis (Trial Tr., Vol. 2 [276] (Richardson) at 207:16–208:14), Kurt Cheesbro (*id.* at 211:16–25), Nicholas Derouin (*id.* at 216:5–14), Roy Pierce (*id.* at 263:3–22), Dalton Adkins (*id.* at 267:4–13), Michael Peterson (Trial Tr., Vol. 3 [277] (Chartier) at 382:4–382:25), and Melanese Sitts (Trial Tr., Vol. 4 [278] (Ruddick) at 610:21–611:10).

provided Bankers Life with 7 days' notice prior to resigning. (JX4 [310] at 102.) ASB did nothing in response.[8]

The Protocol not only required the agents to provide Bankers Life with notice—it also required *ASB* to give notice, and ASB never did so. During the five-year period that the Protocol was in force, ASB never once notified Bankers Life when it onboarded a former Bankers Life agent, despite § II.A of the Protocol requiring ASB to "notify [Bankers] when it engages or hires a current or former [Bankers] agent." (Trial Tr., Vol. 5 [279] (J. Sweeney) at 996:24–997:6; 999:14–18; Protocol [158-44] at 4.) Mr. Sweeney explicitly acknowledged this breach at multiple points in his trial testimony, calling it an "oversight," and claiming that he was not aware of the problem "until really right before the litigation." (*Id.* at 1000:6–8.) He further testified:

> It was an oversight. We never knew we were supposed to do that. It would have been so easy to put that step in. It would have been nothing to just put in a trigger that if somebody answered the question wrong, that we would -- I'm sorry -- that if somebody said that they were coming from Bankers, that we would just send them a notice. I don't even know who we were supposed to have notified, because no one was ever identified in terms of, hey, if someone comes from Bankers to ASB, which is the whole reason we set up the protocol, please send Bob Smith a note, or any human.

(*Id.* at 999:21–1000:5.) He explained this by claiming that "Bankers never raised the issue of lack of notice" during the period that the Protocol was in force, but it is not clear that Bankers was aware of the extent to which ASB had violated the Protocol in the years prior to the filing of this lawsuit. (*Id.* at 1001:21–23.) Nor does a contracting party's failure to notify the other of a breach excuse the breach, especially when the language of the contract is so clear.

ASB's lackluster compliance with the Protocol appears to emanate from two causes. First, as discussed above, ASB relied on agent representations during the Protocol Survey that turned out to be false. Some ASB representatives, most notably Jim Sweeney, appeared to believe that

[8] In addition, it appears that at least three agents—Mr. Darsaklis, Mr. Cheesbro, and Ms. Kaakouche—lied on their Protocol Survey by stating they were not subject to restrictive covenants with Bankers Life. (Pl. Tr. Br. [288] ¶ 51.) These agents were subsequently onboarded by ASB.

asking questions was the only thing required of ASB by the Protocol: he testified at trial, for instance, that the Protocol only required ASB to "ask [agents] questions and advise them of their obligations." (*Id.* at 927:8–16.) Second, ASB appears to have relied heavily on managers to force agents to abide by the Protocol. (*See id.* at 995:7–996:23.) But this reliance is puzzling, as RSMs were not parties to the Protocol, and those RSMs that are Defendants to this case have repeatedly denied exercising any oversight over their agents. (*E.g.*, Trial Tr., Vol. 4 [278] (Ruddick) at 614:19 ("I'm not a party to the protocol."); *id.* at 616:20–617:16.) It is also somewhat inconsistent with ASB's insistence that the company exercises no oversight over RSMs and that RSMs and ASB are entirely independent from one another. (*Cf., e.g.*, Trial Tr., Vol. 5 [279] (Jewett) at 1021:10–14.) The fact that ASB apparently trusted RSMs to fulfill ASB's own contractual obligations suggests that the relationship was closer than Defendants acknowledge.

In the end, there was substantial non-compliance with those obligations. The evidence at trial showed that at least two dozen agents[9] moved from Bankers Life to ASB with Bankers' secrets in tow. Many of these agents were later sued by Bankers, and implicitly admitted during those proceedings that they had stolen Bankers' materials during their departures.[10] ASB did not discipline or terminate any of these agents, nor did they notify Bankers Life that they had been onboarded, in apparent violation of the Protocol.

The materials that these agents took with them from Bankers Life appear to be, predominantly, customer lists. (Pl. Tr. Br. [288] ¶ 72.) While mere lists of sales targets are, in many cases, not protectable as trade secrets, Bankers Life's lists were something more. They

---

[9] Those agents are: Olga Ascione, Adam Beasley, Ryan Bottoms, Robert Cohen, Fred Goodnight, Matthew Hall, Evan Howard, Jessie Jansen, Paul Kemper, Justin Lawrence, Robert Laylock, Jetta Lester, Kristen Rennerfeldt, Jarrold Weiser, Arielle Williams, Nicholas Derouin, Constantine Darsaklis, John Naveroski, Anthony Dickerson, Madyson Derouin, Gayle Monroe, James Nelson, Alyssa Vinke, Michael Strauss, Matthew Dalton Adkins, Christan McDaniel, Mr. Sanchez, and Mr. Diaz. (Pl. Tr. Br. [288] ¶¶ 63–65.)

[10] One of these cases, *Bankers Life & Cas. Co. v. Derouin, et al.*, 20 C 50340 (N.D. Ill.), was litigated before Judge Johnston of this court.

included additional consumer details, and are thus more accurately described as "compilations that combine sensitive and private expressions of existing and potential customers about their financial goals, precise income, investments, existing insurance coverage, risk tolerance measures, product preferences, family priorities, personal aspirations, medical conditions, needs assessment, attorney and account contracts, and other nuanced information." (*Id.*) The lists are valuable for insurance agents for obvious reasons—they can be used to identify potential customers and tailor sales efforts, timing, and strategies to those customers in order to sell them insurance products. (*Id.*) They can be particularly valuable for departing agents, as an agent can contact policyholders that he or she worked with at one company and invite them to transfer their policy to the new company. Bankers considers these lists to be trade secrets; to protect them, it (1) places contractual limits on their disclosure, (2) restricts access to them, (3) requires paper versions to be kept "under lock and key," (4) monitors agent download reports for suspicious activity, (5) sends cease and desist letters, (6) and brings lawsuits against departing agents who take these lists with them. (*Id.* ¶¶ 73–74.)

Evidence at trial confirmed that many Bankers Life agents took customer lists with them when they left to go work for ASB. The evidence was circumstantial—usually in the form of download reports—but overwhelming, and the court has no trouble concluding that agents stole client lists. (*E.g.*, *id.* ¶¶ 63–66.) It appears that the notice provision of the Protocol was designed, in part, to give Bankers Life an opportunity to prevent this from happening. The text of the agreement itself states that after receiving the 7-day notice, Bankers Life would "run a download report and work with the departing employee/agent to ensure return of all [Bankers Life] company information . . . [and would] meet with said employee/agent prior to departure to ensure that hard copies of [Bankers Life] company information are left in the office." (Protocol [158-44] § I.C.1.) ASB's violations of the Protocol denied Bankers Life this opportunity. Thus, the court finds that ASB's (1) failure to require agents to give 7-days notice to Bankers Life prior to their departure, (2) failure to otherwise notify Bankers Life when it onboarded former agents, and (3) failure to

terminate agents for misconduct, or invoke the Protocol's "exhaustion of remedies" provision,[11] caused Bankers Life to lose customers and at least some revenue—though, as described below, Bankers Life was unable to establish (even in a general way) the number of customers or amounts of money it lost as a result of these breaches.

What is less clear, however, is whether ASB was aware that agents were misappropriating trade secrets. Bankers did present some evidence that ASB and ASB's leadership were aware in the abstract that ASB was onboarding agents who had stolen Bankers Life trade secrets (*e.g.*, Trial Tr., Vol. 5 [279] (J. Sweeney) at 998:16–20), but ASB insists it had no need or desire for Bankers Life's customer lists, and the evidence that ASB knew that specific agents had possession of Bankers Life's information is very limited. When ASB did become aware that its agents possessed the information, ASB responded by sending the aforementioned "Trigger Letter" (*id.* at 928:16–929:6), but took no additional actions, evidently because the company internally believed it was not "responsible" for overseeing agents. (*Id.* at 926:15–16; *see also* Trial Tr., Vol. 5 [279] (Jewett) at 1024:13–15.) It is not clear who, if anybody, Defendants believe had this "responsibility," as the managers also disclaim any insinuation of supervision over agents. Bankers Life is rightfully frustrated by Defendants' repeated finger-pointing and hand-washing. In fact, it appears that the Protocol was designed to prevent this exact situation by placing obligations on ASB directly, and not on managers, downlines, or any other figure within ASB's Byzantine apparatus.

ASB is thus liable for its own breaches of the Protocol, but Bankers Life has charged it with other wrongdoing as well. Here, the evidence is not compelling. There is no evidence that ASB intentionally interfered with Bankers Life's contractual relations, nor that Bankers Life knowingly accepted or ratified agents' misappropriation of trade secrets. ASB's witnesses

---

[11] Mr. Sweeney acknowledged in his testimony that ASB "never invoked" the Protocol's exhaustion of remedies provision "when it learned that somebody had come to ASB with Bankers' information." (Trial Tr., Vol. 5 [279] (J. Sweeney) at 998:25–999:3.)

testified that they had no need to encourage misappropriation because ASB could attract business on its own, and did not intend to profit from its agents' misconduct. The court has no praise for ASB's failure to discipline or exercise oversight over its agents, but the evidence did not support a finding of tortious interference, theft of trade secrets, or vicarious liability for agent wrongdoing.[12]

With respect to Defendant Key and its owner, Mr. Ruddick, the situation is different. Ruddick admitted at trial that he recruited many Bankers Life agents (approximately 30) to leave Bankers and join him at Key. (Trial Tr., Vol. 4 [278] (Ruddick) at 739:15–17.) This recruitment is not concerning on its own, as Ruddick was not subject to any restrictive covenants with Bankers Life at the time.[13] (*E.g.*, *id.* at 725:21–24.) But what is suspicious is that at least seven of these agents were later found to have taken confidential Bankers Life information when they left the company (*id.* at 740:3–10). This occurred on at least three occasions:

- In 2021, Ruddick recruited a group of four agents from a Bankers Life office in Arizona: Nadine Kaakouche, Dan Johnson, Lelia Scott, and Darshay Poage. (*Id.* at 713:3–7.) All four individuals downloaded Bankers Life information prior to their departure, and all four were later sued by Bankers Life. (*Id.* at 717:6–9; Pl. Tr. Br. [288] ¶ 62.) Ms. Kaakouche then wiped her computer, despite a court preservation order. In response, Ruddick did nothing: he did not discipline her, terminate her, or investigate whether the insurance policies that she was writing resulted from stolen Bankers' information. At trial, he explained his inaction by stating that he did not know "what I was supposed to have done." (Trial Tr., Vol. 4 [278] (Ruddick) at 618:3–618:9.) He also commented that he "didn't even find [Kaakouche's actions] suspicious" because of his "experience with dealing with . . . the Bankers' side of the attorneys." (*Id.*) He did not explain what he meant by this.

- Ruddick also recruited two agents—Andres Sanchez and Berniece Diaz—from Bankers Life's Las Vegas office. Sanchez and Diaz were later sued by Bankers Life for misappropriation of trade secrets, and Ruddick did

---

[12] The same goes for Defendants Heartland and Integrity. The record on these two companies is slim, and as explained below, does not support a finding of either direct liability or vicarious liability.

[13] Mr. Ruddick's non-solicitation agreement expired on June 30, 2020. (Trial Tr., Vol. 4 [278] (Ruddick) at 698:22–699:12.)

nothing in response other than asking them if the allegations were true.[14] (*Id.* at 615:25–616:8.)

- In August 2020, Mr. Ruddick learned that a group of Bankers Life agents led by Nicholas Derouin had suddenly departed the company's Rockford, Illinois office. (*Id.* at 699:21–700:3.) Ruddick called them, and they revealed that they had been "going through the onboarding process with TAG," a different IMO that competes with ASB. (*Id.* at 700:10–11.) Ruddick convinced Derouin and his group to join Key instead. Derouin was later sued by Bankers Life for misappropriation of trade secrets, and a forensic investigation in this lawsuit revealed that Derouin had some Bankers Life documents on his computer, including a few with client information. Ruddick did nothing in response. (*Id.* at 614:24–615:24.)

Mr. Ruddick was certainly aware of the restrictive covenants between these agents and Bankers, given that he himself is an alumnus of Bankers Life. (*Id.* at 650:20–650:25.) And, notwithstanding his repeated denials, the court finds that Mr. Ruddick was more intimately aware of his agents' theft of trade secrets than he acknowledged at trial. In his trial testimony, Mr. Ruddick was often evasive, often contradicted his deposition testimony, and repeatedly attempted to downplay his inaction in response to agent misconduct. (*E.g.*, *id.* at 616:13–617:16.) A few examples: In his deposition, Ruddick testified that Key did not have to pay ASB for training and technology services. At trial, Ruddick denied that he received those services for free. (*Id.* at 599:16–600:1.) In his deposition, Ruddick testified that he took no action after learning that Bankers Life's information was discovered on Mr. Derouin's computer. At trial, he claimed that wasn't "exactly true." (*Id.* at 615:6.) And during his deposition, Ruddick testified that there was "nothing else [he] could have done" after learning of the allegations against Sanchez and Diaz. (*Id.* at 616:23–617:14.) At trial, Ruddick claimed that he directed them to comply with the instructions of Bankers' lawyers. (*Id.* at 616:13–617:16.) True, these contradictions are not blatant, and Ruddick appeared to believe that he was providing important context to his deposition

[14] During his trial testimony, Ruddick claimed that he told Sanchez and Diaz to "comply with Bankers Life legal department." But during his deposition, he claimed that he did nothing other than asking them if the allegations were true. (Trial Tr., Vol. 4 [278] (Ruddick) at 616:7–617:16.) Inconsistencies like this were common during Ruddick's testimony.

testimony. The inconsistencies are nevertheless troubling, and Ruddick's testimony and overall demeanor led the court to conclude that he was not being entirely forthcoming about what actions he took (or, more accurately, what actions he did *not* take) in response to agent misconduct.

There is little evidence that Ruddick actually directed or conspired with agents to misappropriate Bankers Life's trade secrets. But the court concludes that Mr. Ruddick was aware that agents had stolen secrets and were using them to sell insurance policies for the benefit of Key Retirement Solutions. The court further finds that Key, via Mr. Ruddick, knew that it personally benefited from agent misconduct, did nothing to stop it, and continued its close and intimate work with the responsible agents despite knowledge of their theft—at least two to this day. (*Id.* at 718:2–3.) Ruddick's decision to do nothing despite abundant evidence of misconduct (and Ms. Kaakouche's flagrant spoliation of evidence) remains puzzling, and was never persuasively explained at trial or in briefing. Mr. Ruddick at one point suggested that he was not troubled by agents' wrongdoing based on his own past at Bankers Life, his animosity towards the company, and his past experience with its legal team. (*Id.* at 618:3–618:9.) While this might be a reason for his actions, it is certainly not a justifiable one.

Thus, as explained more fully below, the court concludes that Key ratified its agents' misappropriation of trade secrets.

## IV. Damages

The court now turns to the most troubling aspect of this case: damages. Bankers Life's damages claim was presented through an expert witness, Jillian Klibanov.[15] (Klibanov Rep. [233] at 19.) Ms. Klibanov is employed by CNO Financial, Bankers Life's parent company, as an actuary. Bankers Life directed Ms. Klibanov to create a model that estimated the company's damages from Defendants' actions. To develop this model, Ms. Klibanov took a list of agents who were "identified by counsel as one of thirty (30) who were the subject of an agreed injunction"

[15] Ms. Klibanov is a member of the American Academy of Actuaries, and has a degree in Actuarial Science from the University of Illinois at Urbana-Champaign. (*Id.* at 21.)

with Bankers Life, or those who had otherwise "left Bankers Life for American Senior Benefits within the last two (2) years." (*Id.*) From this list, counsel then identified which of those agents' policies were "terminated within two years of the agent's termination date," where the policy's termination was "due to lapse or surrender." (*Id.*) Ms. Klibanov then assessed Bankers Life's losses from those policies based on the following formula:

- Present value of expected pre-tax earnings after the date of lapse, LESS
- Reserves expected to be released upon termination, LESS
- Risk-based capital expected to be released upon termination, PLUS
- Cash value expected to be paid upon termination.

(*Id.*). In her expert report, she concluded that Bankers Life suffered "damages in excess of $937,418." (*Id.*)

Even on its face, this methodology is suspect. Most notably, it does not account for the circumstances of each policy that lapsed or terminated. Instead, Klibanov simply took a list of Bankers-to-ASB agents and assumed, without any independent investigation or analysis, that *any* policy written by those agents that lapsed or terminated within two years did so due to agent misconduct. That assumption surely overstates the case: insurance policies lapse for non-payment, or because policyholders no longer need the coverage or take their business elsewhere for a variety of reasons. The fact that a given policyholder left Bankers Life does not necessarily mean that the agent wrongfully cajoled her to transfer her policy to ASB. (Trial Tr., Vol. 3 [277] (Klibanov) at 544:6–13.) Still, despite these concerns, the court overruled Defendants' pre-trial *Daubert* motion [233] and allowed Ms. Klibanov to testify.

Defendants' concerns were vindicated at trial, as Plaintiff's damages model fell apart under scrutiny. Upon cross-examination by defense counsel, it was revealed that numerous policies included in Ms. Klibanov's calculations—indeed, the vast majority—should never have been included in the model in the first place. Some agents were included even though they left Bankers Life for Transamerica, a different company unrelated to ASB. (Trial Tr., Vol. 3 [277] (Klibanov) at 560:9–562:6.) Another agent was included despite having joined The Assurance

Group, another insurance company unaffiliated with ASB. (*Id.* at 562:18–565:10.) The lapse of policies written by these agents obviously cannot be attributed to these Defendants, as the agents never associated with them. There were other errors, as well. A few agents were included despite having left Bankers Life years before the Protocol was signed, and others wrote policies that lapsed or were surrendered before the conception of the Protocol. (*Id.* at 571:25–572:22.) One agent was listed with the wrong termination date, resulting in the erroneous inclusion of certain policies in the damages model. (*Id.* at 557:6–558:25.) And perhaps most importantly, many of the agents included in the model were never mentioned at all at trial, leaving the court guessing as to whether they committed any misconduct at all.

Ms. Klibanov herself was not personally responsible for these errors in her model. The court found her personally credible and competent during her trial testimony, and does not question her qualifications or abilities as an actuary. Instead, it appears that these errors resulted from her reliance on a list that was evidently provided by Bankers Life or its counsel. In any event, the exposed shortcomings in her model dramatically reduced Plaintiff's damages claim. Ms. Jewett, an ASB executive who testified extensively about the errors in Klibanov's model, noted that roughly one-quarter of Plaintiff's damages demand (~$230,000) was premised on agents who *never once worked for ASB*, and one-half (~$475,000) was based on the value of lapsed policies from policyholders who *never purchased insurance from ASB*. (Trial Tr., Vol. 5 (Jewett) [279] at 1046:1–18; 1046:19–1047:21.) She noted, further, that Bankers Life had already recovered a large amount of the remainder via prior lawsuits against individual agents. (*Id.* at 1054:9–1065:19.) In short, it was clear that Bankers Life's damages model was nowhere close to being a reliable method of assessing damages.

Counsel for Bankers Life acknowledged that the first version of its model was riddled with errors. They quickly worked to rehabilitate it. Late in the evening on one of the last days of trial, Bankers Life produced a revised damages model that purportedly fixed the issues facing the prior iteration. The revised model pegged Bankers' damages at $220,000, a reduction of nearly 80%

from the one originally proffered. (Trial Tr., Vol. 6 [280] at 1156:15–23.) Bankers then called Ms. Klibanov again as a rebuttal witness, and she attempted to rehabilitate the model. But many of the errors remained. For example, the revised model still did not adjust the claim to account for Bankers Life's recovery in lawsuits against individual agents (*id.* at 1196:1–10), and it continued to include policies written by agents never mentioned at all at trial (*id.* at 1192:24–1193:17).

In Bankers Life's post-trial briefing, the company slashed its damage claim in half once again, to $104,659.75 (Pl. Tr. Br. [288] ¶ 81), and produced yet a third iteration of its damages spreadsheet. But given the prior errors in the model, and the fact that there was no further cross examination, the court cannot help but question the accuracy of this new model. And it appears that there continue to be discrepancies: At least seven of the agents identified in the revised spreadsheet—Devon Blaylock, Jonas Patterson VI, Jordyn Powers, Lance Williamson, Lynn Siv, Omar Torres, and Rex Young—were not mentioned in Plaintiff's post-trial briefing at all, so the court is left to guess about the misconduct (if any) these agents engaged in. Moreover, Bankers instead appears to argue that Defendants are on the hook for the assessed value of each and every lapsed policy, regardless of the reason that policy lapsed. Defendants' violations of the Protocol are unexcused, but Bankers Life has not been able to link those violations to specific losses in any reliable way.

The court concludes that Plaintiff's damages model is unpersuasive and unreliable, and does not present an accurate estimation of the damages Bankers Life suffered.

## CONCLUSIONS OF LAW

### I. Breach of Contract

The gravamen of Plaintiff's case is a breach of contract claim, brought against ASB, for violations of the Protocol. "The required elements of a breach of contract claim in Illinois are the standard ones of common law: '(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages.'" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 560 (7th Cir. 2012).

That the Protocol is a valid contract is undisputed. The Protocol was adopted as part of a settlement agreement, and under Illinois law, settlement agreements are legally valid contracts. *K4 Enters., Inc. v. Grater*, *Inc*., 394 Ill. App. 3d 307, 313, 914 N.E.2d 617, 624, 333 Ill. Dec. 198, 205 (1st Dist. 2009). In summary judgment briefing, Defendants argued that the Protocol was not a valid contract, but the court rejected that argument, and Defendants do not renew it here. The court finds that a valid and enforceable contract exists.

It is also clear that ASB breached the Protocol in numerous ways. First, ASB never once gave Bankers Life notice that one of its agents was joining ASB. This requirement was in the Protocol—so it presumably had some value to Bankers Life—and was obvious on the document's face. The company's failure to provide this notice constitutes a breach of § II.A of the Protocol. The court accepts Mr. Sweeney's representation that ASB's failure to give notice was not intentional, but a contract breach is actionable even if unintentional. Second, ASB routinely failed to require its agents to give Bankers Life 7-day notice before departing. As detailed above, evidence supports a finding that ASB knew or should have known that agents were failing to give the notice required by the Protocol. ASB's failure to require them to do so constitutes a material breach of § I.C of the Protocol. And third, ASB failed to hold its agents accountable once it learned of their misdeeds. Section II.C of the Protocol required ASB, when it learned of problems with agents, to either "instruct the [agent] to stop the violations" and "end the relationship with the [agent,]" or "instruct the [agent] to stop" and "invoke the exhaustion of remedies protocol." (Protocol [158-44] at 4.) Preponderant evidence shows that ASB did neither. Each of these violations constitutes a breach of contract under Illinois law. *See Wigod*, 673 F.3d at 560.

ASB offers a number of arguments in an attempt to sidestep liability for its breaches, but none are persuasive. The company first claims that "the Protocol did not obligate ASB to enforce or guarantee agent compliance with Bankers' restrictive covenants," that it did not require "ASB to verify the truth of agents' answers to the onboarding questionnaire," and that it was not intended to require ASB to "assert control over independent agents' conduct." (Defs. Tr. Br. [289] ¶ 31;

Defs. Tr. Reply [299] at 5.) These arguments are each cut from the same cloth—ASB takes the position that its Protocol obligations were limited to providing notice, and that ASB had no independent, active obligation to ensure its agents were following the rules. (*See* Defs. Tr. Reply [299] at 4–5.) The court respectfully disagrees. As noted above, ASB was certainly aware that agents were violating the 7-day notice requirement: the Protocol required ASB to obtain a copy of that notice from each individual agent, so if ASB had been obtaining that copy as required, it would have known that agents' answers were false. More broadly, ASB's continued insinuations that it has no obligation to investigate the veracity of agents' responses to the Protocol Survey, or to discipline agents for violations, ring hollow. The text of the Protocol makes clear that ASB agreed to "require" agents to give notice to Bankers Life, to "instruct" agents to cease prohibited conduct, and to "end the relationship" with individuals who violate its terms. (Protocol [158-44] §§ I.C, II.C.) The agreement thus contemplates that ASB had some manner of control over agents, or at the very least would terminate those that did not comply. If ASB truly had no power to "require" its agents to do anything, one wonders how ASB in good faith would have agreed to the Protocol in the first place, or why the company would make promises it knew it could not keep.[16]

ASB offers another argument, essentially the inverse of the first: that ASB's failures to abide by the Protocol's notice provisions were "de minimis" breaches that do not constitute a breach under Illinois law. (Defs. Tr. Br. [289] at 18 (quoting *Brandt v. Bd. of Educ. of City of Chicago*, 480 F.3d 460, 465 (7th Cir. 2007)).) This argument is in some tension with the first: ASB apparently believes the Protocol was solely about notice, not disciplining agents, but simultaneously believes that failures to provide that notice are "trifles" that do not constitute a

[16] The court expressed skepticism towards this contention during closing arguments, asking defense counsel, "if the downstream agents and so forth were not under the control of ASB, what was the meaning of the protocol? Did ASB believe that it was entering into a protocol that was effectively unenforceable because it had no control over the agents?" (*See* Closing Arg. Tr. [294] at 1255:22–1256:10.)

material breach at all. (*Id.*) One wonders which Protocol provisions, if any, ASB deemed mandatory—or why ASB believes Bankers Life entered into an agreement that has no real teeth.

In any event, the court disagrees that breaches of the notice provisions were de minimis. They were a material part of the contract; adherence to them was not optional. The text of the Protocol makes clear that Bankers Life desired notice of ASB's onboarding of its agents so that it could promptly run download reports and work to mitigate any misappropriation of trade secrets. ASB's failure to see that Bankers Life was properly notified deprived the company of this opportunity, a concrete harm that almost certainly resulted in some financial loss (albeit in amounts Bankers Life has been unable to prove with specificity). The failure to provide notice constitutes a material breach of contract.[17]

During trial, ASB raised a third argument: that Bankers Life's failure to invoke the "exhaustion of remedies" provision of the Protocol—which lays out detailed alternative dispute resolution procedures, including mediation—bars them from recovery here. Specifically, they claim that the provision constitutes a condition precedent to filing suit. (Defs. Tr. Br. [289] at 18 n.3.)

The court rejected that argument in an earlier order (Order [268]) and declines to revisit the matter for two reasons. First, the Protocol does not require exhaustion of remedies prior to a suit against ASB. The cited provision of the document states that remedies "must be exhausted prior to the commencement of litigation against the *offending agent/employee*." (Protocol [158-44] at 4 (emphasis added).) This lawsuit is against *ASB itself*, and no individual agent/employee

---

[17] Citing to *Stonecrafters, Inc. v. Foxfire Printing & Packaging, Inc.*, 633 F. Supp. 2d 610 (N.D. Ill. 2009), ASB argues that this court "has previously dismissed cases where the harm to a plaintiff was "minuscule to the point of nonexistent." *Id.* at 614. *Stonecrafters* was a strange case involving a sweeping federal lawsuit brought after the plaintiff received an unwanted one-page advertisement via fax. The plaintiff claimed damages due to "loss of the paper and toner used to print the fax and a loss of its employees' time that was spent receiving, reviewing, and routing the fax." *Id.* at 612. That case is distinguishable. ASB's failure to provide notice to Bankers Life clearly caused harm to Bankers Life above and beyond a minuscule amount of paper and toner.

is a party to this case. That provision is inapplicable. Second, to the extent the provision has any application here, ASB has waived the failure-to-exhaust-remedies argument. Failure to raise an alternative dispute resolution clause in a contract can constitute waiver if the parties proceed in a way inconsistent with a desire for an alternative forum. *See Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 636–37 (7th Cir. 2022) (Illinois law) (explaining that a condition precedent is waived when a party's conduct is "wholly inconsistent" with the condition); *see also Al-Nahhas v. 777 Partners LLC*, 129 F.4th 418, 426–27 (7th Cir. 2025). Defendants have persisted with federal court litigation for several years, and engaged extensively in discovery and in pre-trial motion practice. Up until the eve of trial, they expressed no desire for an alternative forum: they did not move to enforce that provision of the Protocol, move for dismissal on that basis, or offer to stay proceedings pending mediation. Accordingly, the court barred Defendants from raising this defense at trial (Order [268]) and stands by that decision today. (*See id.* at 2 ("To put it simply, a party that opts to forego alternative dispute resolution in favor of federal court litigation cannot assert its right as a 'gotcha' moment at a late stage of proceedings.").)

* * * * *

To sum up: the court concludes that Plaintiff has shown, by a preponderance of the evidence, that ASB breached the Protocol. Judgment will be entered in Plaintiff's favor on the breach of contract claim.

## II. Misappropriation of Trade Secrets

Bankers Life also accuses Defendants of misappropriating its trade secrets, in violation of the federal Defend Trade Secrets Act ("DTSA") and the Illinois Trade Secrets Act ("ITSA"). Because the elements of both statutes are "materially identical," the court considers both in tandem.[18] To recover under either statute, a plaintiff must show that "(1) a trade secret existed;

[18] There is a minor distinction between both statutes. Vicarious liability under the ITSA, a state statute, is determined by Illinois agency law. Because the DTSA is a federal statute, however, vicarious liability under it is governed by federal common law. *See Bakov v. Consol. World Travel, Inc.*, No. 15 C 2980, 2019 WL 6699188, at *5 (N.D. Ill. Dec. 9, 2019) (explaining

(2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation." *Ocean Tomo, LLC v. PatentRatings, LLC*, 375 F. Supp. 3d 915, 951 (N.D. Ill. 2019); *see also* 18 U.S.C. § 1836(b)(3)(B).

Bankers Life's client and lead lists were trade secrets. As the court noted in its summary judgment ruling, to prove that a particular use of information is a trade secret, the court considers (1) the extent to which "the owner thereof has taken reasonable measures to keep such information secret", and (2) whether "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *See* 18 U.S.C. § 1839; *see also* 765 ILCS 1065/2(d) (using an essentially identical definition). Both tests are met here. Preponderant evidence put forward at trial showed that Bankers Life took numerous steps to protect its trade secrets, including by restricting access, bu regularly monitoring systems for suspicious activities, by sending cease-and-desist letters against agents who are believed to have stolen secrets, and by instigating legal proceedings against them. Likewise, the evidence clearly showed that client lists and lead lists were information that "derive[s] independent economic value" from their secrecy, as they incorporated information that was collected by Bankers Life at some expense and was not commonly known in the industry. *See Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, No. 17-CV-5826, 2023 WL 5334638, at *14 (N.D. Ill. Aug. 18, 2023) ("Customer lists, meaning a business's collection of customer identities, are protectable trade secrets."); *see also* 765 ILCS 1065/2(d) (explicitly identifying a "list of actual or potential customers" as trade secrets). The court thus has no trouble concluding that Plaintiff has shown that trade secrets "existed" in this case. *See Ocean Tomo*, 375 F. Supp. 3d at 951.

---

the same in a case under the Telephone Consumer Protection Act). This distinction is "mostly academic," as "the foundational principles of agency law are uniform across the country," so this distinction does not affect the outcome of the court's legal conclusions here. *Pyatt v. Int'l Longshoremen's Ass'n Loc. 1422*, No. 2:23-CV-05772-DCN, 2025 WL 1558587, at *7 (D.S.C. June 2, 2025).

Defendants counter that Bankers Life's client and lead lists are not secret because they can be purchased for a low cost from third-party vendors. (*E.g.*, Defs. Tr. Br. [289] at 14–17.) But as multiple witnesses noted at trial, Bankers Life's client lists include sensitive compilations of other non-public information, such as consumer "financial goals, precise income, investments, existing insurance coverage, risk tolerance measures, product preferences, family priorities, personal aspirations, detailed medical conditions, attorney/accountant contacts, and other nuanced information." (Pl. Tr. Reply [300] at 10.) The court credits ASB's contention that bare-bones lists can be purchased for pennies on the dollar, but Bankers Life's lists included other secret information that distinguishes them from publicly available consumer lists. It is thus protected by the trade secret statutes. *See, e.g.*, *3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001) (affirming jury verdict finding defendant liable for misappropriation of trade secrets, recognizing that a "unique combination" of publicly available information can qualify as a "protectable secret"); *see also Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) ("Trade secrets include customer lists that are not readily ascertainable . . . ." (citation and internal quotation marks omitted)).

But while it is clear that agents misappropriated trade secrets, it is less clear whether any Defendant can be held vicariously liable for the activities of their independent-contractor agents. In general, "a person injured by the tortious action of another must seek his or her remedy from the person who caused the injury." *Flowers v. Wexford Health Sources, Inc.*, No. 19-cv-6423, 2024 WL 2817487, at *12 (N.D. Ill. June 3, 2024). Plaintiff contends that Defendants too are responsible for the agents' wrongdoing under the agency law doctrines of actual authority or ratification. (Pl. Tr. Br. [288] ¶¶ 20, 35.) Actual authority requires that, at the time of the agent's conduct, "the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021) (citing RESTATEMENT (THIRD) OF AGENCY § 2.01 (A.L.I. 2006)). A finding of actual authority requires plaintiff to show "(1) a principal/agent relationship exists, (2) the principal

controlled or had the right to control the alleged agent's conduct, and (3) the alleged conduct fell within the scope of the agency." *Bilek*, 8 F.4th at 587. A contract that explicitly creates an agency relationship is the most basic example of actual authority. *Thompson v. Sutherland Glob. Servs., Inc*., No. 17 C 3607, 2019 WL 1470238, at *7 (N.D. Ill. Apr. 3, 2019). Ratification, on the other hand, "is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *See* RESTATEMENT (THIRD) OF AGENCY § 4.01(a). Ratification is present when one "knowingly retained [] benefits" acquired in an unlawful way. *Hossfeld v. Allstate Ins. Co.*, 179 F.4th 1046, 1057 (7th Cir. 2026).

The court concludes that one defendant, Key Retirement Solutions, is vicariously liable for agents' misappropriation of trade secrets. As explained above, Mr. Ruddick, Key's leader, knew that several agents within his downline had misappropriated trade secrets when they came over from Bankers Life. Ruddick took no action against these agents,[19] and did not repudiate the transaction in any way. By actively choosing to continue benefiting from agents' misconduct despite being personally aware of significant evidence of said misconduct, Ruddick ratified his agents' misappropriation of trade secrets. This renders Key vicariously liable under the principles of agency law.

The court concludes differently with respect to ASB. First, contrary to Plaintiff's contention, there is no actual authority in this case. There is not enough evidence to conclude that ASB had the "right to control" its agents' conduct. To be sure, the company's contracts with agents did give the company authority to take some limited actions in response to agent misconduct and the like, but Plaintiff did not put forward enough evidence to show that ASB's relationships with its agents were close enough to justify a finding of actual authority. The forms of control that Plaintiff points to—determining who gets hired and fired, determining how much to pay them, and requiring limited compliance with external rules—resemble the relationships that businesses typically have

[19] Those agents are Kaakouche, Johnson, Scott, Poage, Sanchez, Diaz, and Derouin.

with independent contractors, not those they have with their employees or agents. Likewise, Plaintiff has also failed to show that ASB ratified agent actions. Unlike Key, whose leader was intimately familiar with the misconduct of 7 agents that he personally recruited to his company, there is no comparable evidence that ASB made a decision to look the other way in the wake of explicit and intimate knowledge of agent misconduct. In the absence of any evidence of actual authority or ratification, there is no basis for holding ASB vicariously liable.

As to the remaining two Defendants, Heartland and Integrity, the court also concludes that no basis for vicarious liability exists. Very little evidence on these companies' activities was presented at trial, certainly not enough to conclude that a principal-agent relationship with ASB agents existed or that they ratified Defendants' conduct.

* * * * *

In conclusion, the court concludes that Plaintiff has shown, by a preponderance of the evidence, that Bankers Life's trade secrets were misappropriated by agents, and that Key ratified that misappropriation and incurred liability under the DTSA and ITSA. On Counts I and II, judgment will be entered against Key, and in favor of all other Defendants.

## III. Tortious Interference

In Count IV of the operative complaint, Bankers Life alleges a claim of tortious interference with contractual relations against all four Defendants. To prevail on such a claim under Illinois law, a plaintiff must show (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages. *See Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1156 (N.D. Ill. 2016) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 154–55, 137 Ill. Dec. 19, 25, 545 N.E.2d 672, 676 (1989)).

Plaintiff claims that the "evidence of agents leaving Bankers for ASB, persuading others to follow them, persuading Bankers' policyholders to terminate their business with Bankers, and

admittedly taking Bankers' confidential information . . . establishes by preponderant evidence that Defendants[] induced their onboarded agents to violate the restrictive covenants of their Agreements with Bankers." (Pl. Tr. Br. [288] ¶ 70.) The court disagrees. There is some evidence that Defendants knew agents were violating their covenants with Bankers Life, but not enough evidence to conclude that Defendants "intentionally interfered" with those contracts by encouraging agents to violate them. *See HPI Health Care Servs.*, 131 Ill.2d at 154. In Illinois, a party seeking to recover for tortious interference must show "active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way." *In re Est. of Albergo*, 275 Ill. App. 3d 439, 446, 656 N.E.2d 97, 103 (2d Dist. 1995). Defendants here did nothing to stop their agents from violating their restrictive covenants; such an omission might have been a violation of the Protocol, but is not enough to establish the "intentional interference" element by a preponderance of the evidence.[20] *See Webb v. Frawley*, 906 F.3d 569, 579–80 (7th Cir. 2018) (Illinois law) (explaining the intent element); *see also* RESTATEMENT (SECOND) OF TORTS § 766, cmt. h ("The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.").

---

[20] Bankers Life points out that Heartland and Key both admitted in pleadings that ASB tortiously interfered with Bankers Life's contracts. (Defs. Tr. Reply [299] at 17.) Defendants, characterizing this as the error of Defendants' prior attorneys, have requested leave to amend their pleadings to fix this "typo." (Mot. for Leave to Amend [286].) This request is denied. Defendants made the admission not just in one pleading, but in *six* total pleadings. (*See* Answers [24, 26, 39, 41, 74, 76] ¶ 5.) A party's admission in answering a complaint is a binding judicial admission, and Bankers Life would surely be prejudiced if the court were to allow an amended pleading this late in the day. Moreover, the court is skeptical of Defendants' contention that this admission was a "typo." (Mot. [286] at 4.) This "typo" was made in a perfectly formatted and grammatically correct sentence that persisted across several amended pleadings filed over the course of nearly a year. In the court's view, the more likely explanation is that Heartland and Key saw strategic value in pointing the finger at ASB for agent misconduct (a troubling strategy choice, as it could create a conflict of interest among parties, all of whom were represented by the same lawyers). While it might well be true that Defendants' current counsel believes that prior counsel's strategic decisions were misguided, that is no basis for the court to allow an amended pleading at this late stage. The court considered these admissions in evaluating the tortious interference claim, but concluded that even with Heartland and Key's admissions, the evidence is not sufficient to enter judgment against ASB on this claim.

The court concludes that Plaintiff has not shown, by a preponderance of the evidence, that Defendants tortiously interfered with their contractual relations. Judgment will be entered in Defendants' favor on Count IV.

## IV. Damages

While Plaintiff has met its burden on the liability front, the court concludes it has not shown it is entitled to damages, for two reasons.

First, as explained above, Plaintiff's damages expert was thoroughly impeached at trial. Her damages model was riddled with inconsistencies and errors, and was shown to be overinclusive by several orders of magnitude. Even Plaintiff's second revised damages model included many of the same errors, even after reducing the total amount sought by more than 80%. The court thus questions the reliability of the model, which appeared to rest on questionable assumptions in the first place.

Second, Plaintiff's damages model makes no effort to trace the damages to particular breaches of the Protocol. It instead assumes, with little cognizable justification, that Defendants are on the hook for all lost profits resulting from lapsed policies, regardless of how that lapse came to be. As explained above, Plaintiff has proved that it was ontologically harmed by ASB's violations of the Protocol—it is fair to say that had the company received the notice envisioned by the Protocol, it could have prevented agents' misappropriation of trade secrets and mitigated the loss of its business. After all, the company bargained for that notice, suggesting that it does have some value. But the court does not share Bankers Life's apparent belief that it is are entitled to the same amount of damages from minor breaches of the Protocol's notice provision as from outright misappropriation of trade secrets. And Bankers Life has pointed to no liquidated damages clause, or any other basis from which the court can assess the damage caused by these breaches. Contract damages need not be determined with "mathematical precision," *Ivey v. Transunion Rental Screening Sols., Inc.*, 2021 IL App (1st) 200894, ¶ 62, 186 N.E.3d 1076, 1090, 453 Ill.Dec. 42, 56 (1st Dist. 2021), but they must be grounded in "reasonable certainty," and

cannot be the product of "conjecture or speculation." *Hill v. DePaul Univ.*, 2024 IL App (1st) 221568-U, ¶ 28, 2024 WL 4234482 (1st Dist. Sept. 18, 2024). Here, even if the damages model was trustworthy (it is not), the court cannot award damages without guessing which harms were caused by violations of the Protocol.

Ultimately, it is Bankers Life's burden to prove both (1) that it suffered damages, and (2) the amount of those damages. *Ollivier v. Alden*, 262 Ill. App. 3d 190, 196, 199 Ill.Dec. 579, 584, 634 N.E.2d 418, 423 (2d Dist. 1994) ("As the party seeking to recover, the plaintiff bears the burden of proving that he or she sustained damages resulting from the breach and establishing both the correct measurement of damages and the final computation of damages based on that measurement."). The court is reasonably certain that the company suffered some financial harm as a result of ASB's violations of the Protocol and by Key's misappropriation of trade secrets, and that a liability verdict in favor of Plaintiff is therefore appropriate. In light of the troubles with Plaintiff's damages model, however, Bankers Life has not shown it is entitled to anything beyond nominal damages. The court will award damages of $1.00 in favor of Bankers Life from both ASB and Key, for a total recovery of $2.00.

## CONCLUSION

On Counts I and II (misappropriation of trade secrets), judgment will be entered in favor of Plaintiff against Defendant Key Retirement Solutions only. On Counts I and II, judgment will be entered in favor of all other Defendants in full. On Count III (breach of contract), judgment will be entered in favor of Plaintiff in full. On Count IV (tortious interference), judgment will be entered in favor of Defendants in full. Nominal damages are awarded in favor of Plaintiff. Defendants' motion for leave to amend [286] is denied. All other motions are stricken as moot.

ENTER:

Dated: August 24, 2026

REBECCA R. PALLMEYER
United States District Judge